**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **Monica Shrader,** | **Case No. 5:24CV01292** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Massillon City School District Board of Education,** | **MEMORANDUM OPINION & ORDER** |
| **Defendant.** | |

Currently pending is Defendant Massillon City School District Board of Education's ("Defendant" or "the Board") Motion for Summary Judgment. (Doc. No. 40.) Plaintiff Monica Shrader filed a Brief in Opposition on February 27, 2026, to which Defendant replied on March 9, 2026. (Doc. Nos. 44, 45.) For the following reasons, Defendant's Motion for Summary Judgment is GRANTED.

## I. Facts

### A. Background

This matter relates to the contentious relationship between two teachers employed by the Massillon City School District ("MCSD") and Defendant's efforts to manage and address the situation during the 2023-2024 school year.

Plaintiff Monica Shrader (hereinafter "Plaintiff" or "Shrader") and Guy Oberhauser (hereinafter "Oberhauser") have been teachers in the MCSD for over twenty years. (Doc. No. 42-50 at PageID# 1679; Doc. No. 42-68 at PageID# 1728; Deposition of G. Oberhauser (Doc. No. 32-1) at Tr. 5.) Both Shrader and Oberhauser are members of the Massillon Educational Association

("MEA"), i.e., the union that represents teachers in the MSCD. (Deposition of A. Johnston (Doc. No. 34-1) at Tr. 6.) At all times relevant herein, Shrader's union rep was Andrea Talkington.

During the majority of the relevant time period, Shrader and Oberhauser both worked in either the Massillon Intermediate School ("MIS") or Massillon Junior High School ("MJHS"). As background, the MIS includes grades four, five and six, and the MJHS includes grades seven and eight. (Deposition of M. Smith (Doc. No. 28-1.) The MIS and MJHS are two separate buildings that are joined by a common area (referred to collectively as "the Middle School Complex"). (Deposition of T. Carr (Doc. No. 36-1) at Tr. 6; Deposition of P. Salvino (Doc. No. 33-1) at Tr. 27.) The common area shared by the MIS and MJHS includes a gymnasium, cafeteria, library (or "media center"), mail room, and administrative offices. (Deposition of A. Talkington (Doc. No. 37-1) at Tr. 95.)

At all relevant time periods, Paul Salvino was the Superintendent of the MCSD and Mark Fortner was the Assistant Superintendent. (Deposition of P. Salvino (Doc. No. 33-1) at Tr. 7; Deposition of M. Fortner (Doc. No. 35-1) at Tr. 5.) Kristina Blair has been the Title VII Coordinator for MCSD since 2022. (Deposition of K. Blair (Doc. No. 38-1) at Tr. 3, 10.)

**B. The 2020 - 2021, 2021 – 2022, and 2022 - 2023 School Years**

Difficulties between Shrader and Oberhauser first arose during the 2020 – 2021 school year. At that time, Shrader and Oberhauser were both seventh grade teachers in the MJHS. (Deposition of A. Remenaric (Doc. No. 31-1) at Tr. 6.) Over the course of the 2020-2021 school year, Shrader raised a number of complaints about Oberhauser, including that he allegedly made negative comments about her in front of students; licked the keyboard, coughed on the phone, and passed gas on the teacher's

chair in the classroom they shared;[1] and verbally assaulted her in front of a student teacher, making her feel physically threatened.[2] *See, e.g.,* Doc. No. 42-22 at PageID#s 1554-1555; Smith Depo. at Tr. 8-9; Deposition of A. Talkington (Doc. No. 37-1) at Tr. 111-112. *See also Shrader v. Massillon City School District Board of Education,* Case No. 5:22CV01559 (N.D. Ohio) (Pearson, J.) (Doc. No. 1-4 at PageID#s 62-66, 68-69).[3]

In January 2021, the MCSD put a plan in place to prevent Shrader and Oberhauser from encountering each other in the school hallways (hereinafter "the 2021 Plan"). (Doc. No. 42-25 at PageID# 1564[4]; Oberhauser Depo. at Tr. 16, 22; Smith Depo. at Tr. 8.) This plan is captioned "Tentative Plan 1/28 – 1/29 (Correction: Until Further Notice)." (Doc. No. 42-25.) Broadly speaking, the 2021 Plan sets forth a daily schedule for when Shrader and Oberhauser could enter and leave various classrooms (as well as a schedule for arrival, workroom usage, lunch, and dismissal) for the

---

[1] During the 2020-2021 school year, the MCSD had certain protections in place due to COVID, including that the teachers (rather than the students) moved between classrooms. (Oberhauser Depo. at Tr. 15; Remenaric Depo. at Tr. 12, 26.)

[2] Oberhauser later acknowledged that he "let his anger get the best of him" and that he has had anger management issues in the past. (Oberhauser Depo. at Tr. 98.)

[3] As discussed *infra,* on September 2, 2022, Shrader filed a Complaint against the MCSD in this Court, which was assigned to District Judge Benita Pearson. *See Shrader v. Massillon City School District Board of Education*, Case No. 5:22CV1559 (N.D. Ohio) (hereinafter "*Shrader I*"). Therein, Shrader asserted federal and state claims against MCSD for sex discrimination and retaliation relating to her complaints against Oberhauser during the 2020-2021 school year. After attending mediation, the parties reached a settlement and the case was dismissed with prejudice on February 8, 2023. As the events surrounding the 2020-2021 school year are relevant to the instant action, the Court will refer herein to Shrader's allegations in *Shrader I,* but will do so for background purposes only.

[4] In its Motion, Defendant cites Doc. No. 39-1 as being the 2021 Plan. (Doc. No. 40 at PageID# 1442.) This is incorrect. Doc. No. 39-1 is an email entitled "Interim Supportive Measures" and is dated February 8, 2024. It is clearly not the 2021 Plan. To the contrary, numerous witnesses identified Plaintiff's Deposition Exhibit CC during their depositions as the 2021 Plan. *See, e.g.,* Blair Depo. at Tr. 15-16; Oberhauser Depo. at Tr. 22; Deposition of A. Talkington (Doc. No. 37-1) at Tr. 9; Johnston Depo. at Tr. 45. Plaintiff's Deposition Exhibit CC is located at Doc. No. 42-25 and is captioned "Tentative Plan 1/28 -1/29 (Correction: Until Further Notice)." (Doc. No. 42-25.) Among others, Oberhauser, Blair, and Shrader's union representative, Andrea Talkington, all identified this document as having been put in place in January 2021 to address Shrader's concerns about passing Oberhauser in the hallway. Thus, the Court construes Doc. No. 42-25 (and **not** Doc. No. 39-1) as the 2021 Plan.

purpose of preventing Shrader and Oberhauser from crossing paths during the school day. (*Id.*) *See also* Oberhauser Depo. at Tr. 16.

According to Shrader, Oberhauser violated the 2021 Plan numerous times during the remainder of the 2020-2021 school year. (Talkington Depo. at Tr. 9, 20-21; Doc. No. 42-22 at PageID# 1553; Smith Depo. at Tr. 8.) *See also Shrader I*, Case No. 5:22cv1559 (Doc. No. 1-4 at PageID#s 64-66.) Shrader (through her union rep, Ms. Talkington) complained about these incidents to the MCSD. (Doc. No. 42-22 at PageID# 1553; *Shrader I,* Case No. 5:22cv1559 (Doc. No. 1-4 at PageID#s 64-65.) In or around March 2021, Oberhauser was reassigned to remote teaching and moved to a classroom at the high school for the remainder of the 2020-2021 school year. (Oberhauser Depo. at Tr. 17; Salvino Depo. at Tr. 18-19.)

On April 8, 2021, Shrader filed a Charge of Discrimination against the MCSD with the Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination and retaliation.[5] *See Shrader I*, Case No. 5:22cv1559 (Doc. No. 1-4 at PageID#s 62-66.) Shortly thereafter, on April 12, 2021, then-MJHS principal Vince Lindsey issued Oberhauser a written reprimand for unprofessional behavior between August 2020 and April 2021. (Doc. No. 42-22 at PageID#s 1553-1555; Oberhauser Depo. at Tr. 11-14.) Oberhauser was placed on unpaid leave for three school days and required to complete professional development training regarding conflict resolution in the workplace. (Doc. No. 42-22 at PageID# 1553-1555.) Shortly thereafter, on May 7, 2021, Superintendent Salvino sent a Memo to Shrader and then-principal Lindsay in which he explained that there was insufficient evidence to support Shrader's internal complaint of sex discrimination and retaliation but nonetheless

[5] Shrader subsequently filed a second EEOC Charge on March 6, 2022, in which she raised additional allegations of sex discrimination and retaliation by MCSD during both the 2020-2021 and 2021-2022 school years. *See Shrader I*, Case No. 5:22cv1559 (Doc. No. 1-4 at PageID#s 55-60).

recommended that "all supportive measures that have been extended to [Shrader] shall be continued." (Doc. No. 42-2 at PageID# 1499; Shrader Depo. at Tr. 30-31.)

During the 2021-2022 and 2022-2023 school years, Shrader and Oberhauser were not located in the same school building.[6] Shrader continued to teach in the Middle School Complex, while Oberhauser taught physical education in an MCSD elementary school. (Oberhauser Depo. at Tr. 18-19; Salvino Depo. at Tr. 18-19.) However, there remained the potential for Shrader's and Oberhauser's paths to cross at all-district events such as convocations and professional development programs. Oberhauser testified that he was "told by administration ... to avoid the first convocation" after he left the Middle School Complex, i.e., the convocation for the 2021 – 2022 school year. (Oberhauser Depo. at Tr. 23-25.) He further testified that he was required to sit with his building principal for the convocation the following school year, i.e., for the 2022-2023 school year. (*Id*. at Tr. 25-26.) Oberhauser complied and there were no issues with Shrader at either of these convocations. (*Id*. at Tr. 23-26.)

An incident did occur, however, during a professional development program in August or September 2022. (Shrader Depo. at Tr. 8-9; Talkington Depo. at Tr. 10-11; Johnston Depo. at Tr. 13-15.) Shrader testified that she and Oberhauser were assigned different classrooms for this event, but that Oberhauser nonetheless came into her classroom and blocked her seat. (Shrader Depo. at Tr. 9.) *See also* Talkington Depo. at Tr. 10-11; Johnston Depo. at Tr. 13-15. Shrader (through Talkington) filed a grievance regarding this incident, which ultimately resulted in Shrader and the MCSD entering into a "Memorandum of Understanding" on September 30, 2022 (hereinafter "the

---

[6] Superintendent Salvino testified that he was contemporaneously aware of the issues between Shrader and Oberhauser and believed that "separation would not be a bad thing with those two employees." (Salvino Depo. at Tr. 20-21.)

September 2022 MOU"). (Shrader Depo. at Tr. 9-10; Talkington Depo. at Tr. 10-11.) In relevant part, the September 2022 MOU provides that (1) "during full-district professional development events and convocation, Shrader and Oberhauser will be assigned seats in different locations in the venue;" and (2) "if Shrader identifies an issue related to proximity, she shall immediately report the issue to the head principal so that the issue may be resolved." (Doc. No. 39-2 at PageID# 1304.) The September 2022 MOU is signed by Superintendent Salvino, Shrader, and union president Alice Johnston. (*Id.*)

Meanwhile, on September 2, 2022, Shrader filed a Complaint in this Court against the Board, alleging that she had been subjected to sex-based disparate treatment and retaliation by school administrators and her peers. *See Shrader I*, Case No. 5:22cv1559 (N.D. Ohio) (Pearson, J.) (Doc. No. 1.) Shrader asserted claims for sex discrimination and retaliation under Title VII and Ohio Revised Code Chapter 4112. (*Id.*) In February 2023, Magistrate Judge Amanda Knapp conducted a mediation conference, during which the parties reached a settlement agreement. The case was dismissed with prejudice on February 8, 2023.

**B. Oberhauser bids back into the MJHS in August 2023**

In or around the summer of 2023, Oberhauser was unable to pass a state test needed to continue teaching physical education at the elementary school. (Oberhauser Depo. at Tr. 18-19; Salvino Depo. at Tr. 19.) Around this same time, a seventh-grade math teaching position opened up at the MJHS. (Oberhauser Depo. at Tr. 18-19.) Oberhauser bid into this position for the 2023-2024 school year. (*Id.*) It is undisputed that, as a union member, Oberhauser had the right under the collective bargaining agreement to bid into this position. (Salvino Depo. at Tr. 25; Blair Depo. at Tr. 18; Talkington Depo. at Tr. 34-35.)

At this time, Shrader was teaching fifth grade at the MIS. (Shrader Depo. at Tr. 26-27; Salvino Depo. at Tr. 26-27.) Superintendent Salvino testified that he was concerned about Shrader and Oberhauser teaching in the same building, as follows:

> Q: ..... What was your concern?
>
> A: ... [M]y concern was that they were going to be under the same roof, albeit two different schools, but those two schools are under the same roof. My concern was even sharing a parking lot, at different times of beginning and ending of the day, if one saw the other, there was going to be a complaint filed by Mrs. Shrader of intimidation and harassment.
>
> Q: What did you do at the beginning of that school year, if anything, to try and prevent any of these issues arising?
>
> A: I had a conversation with our union president once again-
>
> Q. Alice Johnston?
>
> A. Yes, sir-- to notify her that [Oberhauser] had in fact bid in-- back into the middle school complex. She indicated that she had heard that as well. We both agreed that he had union rights as well. Per our negotiated agreement, members have the right to bid into a certified area, and the most senior will receive that-- you know, the award of the new position. And there was nothing we can do. And we need to hope that two years prior of no major issues can-- can continue.

(Salvino Depo. at Tr. 24-25.) Salvino further explained that, at the time, he believed that "dredging things up from two years ago would have potentially created additional issues that currently weren't there at the beginning of the school year." (*Id*. at Tr. 79.)

Likewise, Ms. Johnston testified that she was notified during the summer of 2023 that Oberhauser was bidding back into the MJHS and that she spoke with Superintendent Salvino about the fact that Oberhauser and Shrader were once again going to be working in the same building. (Johnston Depo. at Tr. 10-11.) Johnston testified that both she and Salvino were "apprehensive" that there "might be problems again." (*Id*. at Tr. 11, 38-39, 41.) Johnston confirmed that "there was an

awareness on behalf of the union and the administration that the two of them in the same complex could create or continue issues that existed between them."[7] (*Id*. at Tr. 45.)

Salvino testified, however, that he decided not to implement a new plan to address potential issues between Shrader and Oberhauser during the 2023 – 2024 school year, explaining as follows:

> Q. Did you think at some point in time it would have been wise to put a plan together to keep those two apart, particularly in the central locations?
>
> MS. BUTCHER: Objection. You can answer.
>
> A: I know that Alice Johnston and I both discussed how it could easily be perceived that if we bring up something that had occurred years prior and put individuals on a plan, that I could face retaliation complaints from the said members, and throw gas on the fire, if you will.

(Salvino Depo. at Tr. 27-28.) For her part, Johnston testified that she did not express any need for putting a plan in place during her conversation with Salvino in the summer of 2023. (Johnston Depo. at Tr. 16.) Nor did Johnston recall talking about whether the administration and/or the union should "talk to" Shrader and Oberhauser prior to the start of the 2023 – 2024 school year.[8] (*Id*. at Tr. 16, 41.) Johnston did, however, call Talkington to let her know that Oberhauser had bid back into the MJHS. (Talkington Depo. at Tr. 8, 12.) Talkington recalled thinking that "this could be a problem" and "may have said something about, you know, we might need to put something in place." (*Id*. at Tr. 8, 12.)

---

[7] Blair testified that she had a "brief conversation" with Salvino during the summer of 2023 about the fact that Oberhauser had bid back into the MJHS. Blair described this conversation as "more of an awareness, to be on alert just in case." (Blair Depo. at Tr. 18.)

[8] Johnston testified that "manag[ing] the workforce is the role of the administration, not the union" and, therefore, the union does not have "any responsibility to manage the interactions between union members." (Johnston Depo. at Tr. 49-50.)

It is undisputed that the MCSD administration did not implement a new plan at the beginning of the 2023 – 2024 school year to address potential issues between Shrader and Oberhauser. However, the parties agree that the September 2022 MOU remained in place during this time.[9] (Salvino Depo. at Tr. 26; Talkington Depo. at Tr. 42-43; Blair Depo. at Tr. 17, 19-20; Johnston Depo. at Tr. 43.) The parties further agree that the September 2022 MOU was limited to convocations and professional development events. (Blair Depo. at Tr. 17; Shrader Depo. at Tr. 23.) Blair testified that, when Oberhauser bid back into the MJHS, she instructed the principals for both the MIS and MJH that, consistent with the September 2022 MOU, Shrader and Oberhauser were to be kept separate during convocations and professional development events. (Blair Depo. at Tr. 19; Deposition of A. Carr (Doc. No. 38-1) at Tr. 12-13.)

During the 2023-2024 school year, Maria Smith was the MIS principal, and Anthony Carr was the MJHS principal. (Smith Depo. at Tr. 5; Carr Deposition at Tr. 5; Blair Depo. at Tr. 24, 26, 33.) Although Smith was generally aware of the issues between Shrader and Oberhauser from the 2020 – 2021 school year,[10] she testified that she did not consider implementing any plan(s) to manage interactions between Oberhauser and Shrader because she "didn't think there was an issue anymore." (Smith Depo. at Tr. 59-60; Doc. No. 42-39 at PageID# 1613.) Carr testified that he was "aware that there was something that was going on" between Shrader and Oberhauser because "it's a school, people talk." (Carr Depo. at Tr. 11.) Carr testified that, during the convocation for the 2023 – 2024

[9] The parties disagree as to whether the 2021 Plan was still in place during the 2023 – 2024 school year. *Compare* Talkington Depo. at Tr. 42-43, 112 and Shrader Depo. at Tr. 61, *with* Blair Depo. at Tr. 19-20, 65.

[10] Smith testified that, prior to being principal of the MIS, she was the assistant principal of the MJHS. In this latter role, she became aware of the issues between Shrader and Oberhauser during the 2020 – 2021 school year. (Smith Depo. at Tr. 7-8.) Smith further testified that she was aware of the 2021 Plan and that Oberhauser had violated that Plan at least once. (*Id*. at Tr. 8-9.)

school year, he told Oberhauser to sit near him (i.e., Carr) in order to ensure that Oberhauser stayed away from Shrader.[11] (*Id*. at Tr. 13.) But Carr testified that (aside from restrictions during convocations and professional development events) he was not informed by the administration that Shrader and Oberhauser "couldn't be around each other" on a daily basis in the Middle School complex. (*Id*. at Tr. 11.)

**C. Shrader raises concerns about Oberhauser**

The 2023 – 2024 school year started off without any incidents or complaints. Indeed, it is undisputed that Shrader did not report any issues or raise any complaints involving Oberhauser between August 2023 and October 20, 2023. (Shrader Depo. at Tr. 35; Salvino Depo. at Tr. 28.) As discussed below, however, several incidents occurred on or after October 20, 2023 that prompted Shrader to file numerous grievances, complaints, EEOC charges, and, ultimately, the instant lawsuit.

**1. The October 2023 Pep Rally Incident**

The first incident reported by Shrader during the 2023-2024 school year occurred at a pep rally on October 20, 2023 (hereinafter "the October 2023 Pep Rally Incident"). This pep rally occurred in the gymnasium of the Middle School Complex and was attended by MIS students.[12] (Smith Depo. at Tr. 16; Blair Depo. at Tr. 28; Johnston Depo. at Tr. 22-23; Doc. No. 42-50.)

---

[11] Shrader testified that, at a gathering after this convocation, the MIS and MJHS principals had a meeting in the cafeteria located in the Middle School Complex. (Shrader Depo. at Tr. 11-12.) Shrader testified that Oberhauser stood at a central table where the food was located and proceeded to socialize "the whole time until the meeting started" so that she could not go to the table to get her food. (*Id*. at Tr. 12-13.) Shrader testified that she had to ask Talkington to get food for her. (*Id*. at Tr. 12-13, 15-16.) *See also* Doc. No. 42-1 at PageID# 1486. Shrader testified that she believed Oberhauser violated a plan at this time (either the 2021 Plan, the September 2022 MOU, or Salvino's May 7, 2021 Memo—she was unsure which) because he had entered and remained in "mutual territory." (Shrader Depo. at Tr. 18-31.) Shrader testified that she chose not to report this incident at the time it occurred because she did not want to "jump to conclusions." (*Id*. at Tr. 32-35, 37.)

[12] It is not entirely clear whether the October 2023 pep rally was solely for MIS students or for both the MIS and MJHS students. Smith testified that this pep rally was for MIS students. (Smith Depo. at Tr. 16.) Carr and Oberhauser testified

Originally, the pep rally was supposed to be emceed by a teacher named Dustin Wilson. (Talkington Depo. at Tr. 30-31; Smith Depo. at Tr. 16-17.) At the last minute, however, Mr. Wilson became sick and was unable to emcee the event. (*Id.*) The cheerleading coach, Kelsey Spino, then asked Oberhauser if he would emcee the pep rally. (Oberhauser Depo. at Tr. 34-35.) Oberhauser agreed. (*Id.*) During his deposition, Oberhauser testified that, at this time, he knew that Shrader was teaching in the MIS and, further, he knew that MIS students would be attending the pep rally. (*Id.* at Tr. 36.) Oberhauser testified, however, that it did not cross his mind that he might run into Shrader at this event, explaining "I don't think about her."[13] (*Id.* at Tr. 30, 34, 36.)

Principal Smith also attended the pep rally. (Smith Depo. at Tr. 16.) She noticed that Oberhauser was present and radioed Blair, who happened to be in the Middle School Complex for a meeting. (Blair Depo. at Tr. 28.) Smith advised Blair that Oberhauser was going to be emceeing the pep rally and Blair decided to attend "in an abundance of caution." (*Id.* at Tr. 28-29.) Blair arrived just as students were entering the gymnasium. (*Id.* at Tr. 28.) Blair and Smith spoke briefly with Oberhauser but did not tell him to leave or to otherwise "steer clear" of Shrader. (*Id.* at Tr. 29; Shrader Depo. at Tr. 50.) It does not appear that either Smith or Blair advised Shrader of the last-

---

that the pep rally was for the entire Middle School Complex, with the MIS and MJHS students arriving in intervals. (Oberhauser Depo. at Tr. 34-35; Carr Depo. at Tr. 14.) This discrepancy is not material, however. The relevant point for purposes of the instant Motion is that MIS students were expected to, and did, attend the pep rally.

[13] Oberhauser testified that, when he returned to the MJHS in August 2023, he thought the "whole deal" with Shrader was done. (*Id.* at Tr. 29-30.) Thus, he testified that, in his mind, he did not think about Shrader or the need to avoid her. (*Id.*) Indeed, Oberhauser repeatedly insisted that he did not think about Shrader, emphasizing that she "is not on my mind constantly out of all the things I do throughout the building on an everyday basis." (*Id.* at Tr. 36-37.)

minute change to have Oberhauser emcee the pep rally.[14] (Smith Depo. at Tr. 17; Shrader Depo. at Tr. 50-52.)

Shrader testified that she did not know that Oberhauser was going to emcee the pep rally and was caught "off guard." (Shrader Depo. at Tr. 52-53.) She testified as follows:

> A: I show up for the pep rally, not knowing he's MC'ing. *** I'm basically hiding from him behind teachers.
>
> Q: How close physically is he while he's MC'ing?
>
> A: It hadn't even started. I'm hiding, basically trying to avoid him. He walks all the way down, right in front of the cheerleading coach, as far as you are from me now, gives me a death stare-
>
> Q: Tell me about that. What's a death stare?
>
> A: Staring you to the point where someone is almost looking into your soul, and barely—barely having the conversation with the person, that I can tell that he made me so uncomfortable, because he's barely having the conversation with the person he saw; looking at me. And I could see that he was staring me dead in the eyes, looking me dead in the eyes. And that I got an anxiety attack, and I didn't want to have it in front of my students, and I left.

(Shrader Depo. at Tr. 40.) Shrader further testified that she believed that Oberhauser did not actually need to talk to the cheerleading coach at that moment and that he "came over for one entire reason, to give me that death stare." (*Id*. at Tr. 65.) Shrader testified that she left the gym quickly, went upstairs to Talkington's classroom, and threw up. (*Id*. at Tr. 66.) Talkington testified that she was present in her classroom when Shrader arrived. (Talkington Depo. at Tr. 51-52.) Talkington testified

---

[14] Although Smith radioed Blair specifically to advise her that Oberhauser was emceeing the pep rally, Smith claimed that it did not "cross her mind" that Oberhauser and Shrader would see each other at the pep rally nor did it cause her any concern that there might be an issue. (Smith Depo. at Tr. 17.) Smith testified that she did not think there was any plan in place at this time that "said they couldn't be in the same room." (*Id.*) Smith testified that she saw Shrader at the pep rally but did not have any interaction with her. (*Id.*)

that Shrader "was in a full-blown panic attack," i.e., she was crying and hyperventilating. (*Id.*) Talkington walked Shrader to the bathroom and could hear her getting sick. (*Id.* at Tr. 52.)

Talkington walked Shrader back to the pep rally once Shrader had gotten "control of [her] anxiety." (Shrader Deo. at Tr. 66; Talkington Depo. at Tr. 53.) Shrader testified that, at the conclusion of the pep rally, she led her students out of the gym through the main exit door. (Shrader Depo. at Tr. 43-44.) She testified that Oberhauser was standing right outside that door "almost touching [her]" as she was leaving, and then he immediately went back into the gym. (*Id.*) Shrader testified that she strongly believed Oberhauser positioned himself near the exit door intentionally to provoke her. (*Id.*) *See also* Talkington Depo. at Tr. 54-55. Shrader acknowledged, however, that Oberhauser did not touch her or talk to her at any point in time during or immediately after the pep rally. (Shrader Depo. at Tr. 41.)

As noted *supra*, Blair and Smith were also present at the pep rally. Blair testified that she saw Oberhauser "trolling around the gym, talking to different people, come up to the two cheerleader instructors who kind of coordinate the rally and have a discussion with them." (Blair Depo. at Tr. 30.) Blair testified that, at that point, Oberhauser was "probably about 5 to 6 feet away" from Shrader, but that it did not cause her (i.e., Blair) concern at that time that Oberhauser was that close to Shrader. (*Id.*) Smith testified that, although she saw Oberhauser talking to cheerleader instructors in the vicinity of Shrader, she did not see any interaction between Oberhauser and Shrader at any point in time during or immediately after the pep rally. (Smith Depo. at Tr. 19-20.) Smith insisted that there was "no contact" between Oberhauser and Shrader, and that Oberhauser "didn't speak to [Shrader], he didn't touch her, [and] he wasn't aggressive." (*Id.* at Tr. 20-21.)

In support of its Motion for Summary Judgment, Defendant manually filed certain video footage of the October 20, 2023 pep rally.[15] The footage of the interior of the gymnasium (i.e., the Pep Rally Gymnasium Footage) is not particularly illuminating. The video camera is located in an upper corner of the gym near the main exit door, providing a birds-eye view of the gym as a whole. *See* Pep Rally Gymnasium Footage. The video is somewhat jerky and blurry at times. Because of the fact that the camera is located at a significant height, it is difficult to view individuals in any detail. However, the video does show the following. Oberhauser (wearing a dark hoodie, red and white pants, and red shoes) enters the gym from the main door (i.e., the door at the bottom right of the video) at approximately 5:09. (*Id*. at 5:09.) Over the next several minutes, he can be seen walking around the gym and talking to various teachers/adults. (*Id*. at 5:09 at 7:40.) At approximately the 7:40 mark, Shrader (with dark hair and wearing an orange shirt and white shoes) enters the gym from the main door with her students, guiding them to their seats on the gym floor. (*Id*. at 7:40.) Between the 7:40 and 9:45 marks, Shrader and Oberhauser are generally in the same vicinity but do not appear to directly interact. (*Id*. at 7:40 to 9:45.)

The video shows the gymnasium filled with students and teachers and other adult staff. Throughout much of the video, Oberhauser can be seen walking around the gym, talking and interacting with students, teachers, and coaches. The video does not clearly show Shrader exiting the gym to go to Talkington's room. Nor does it clearly show when she returns to the gym after getting

---

[15] This footage is authenticated via an Affidavit from Blair. (Doc. No. 39-29.) Specifically, Blair identifies the video entitled "Copy of Copy of Gym—102023.mp4" as a true and accurate copy of video of the interior of the gym during the October 20, 2023 pep rally (hereinafter "Pep Rally Gymnasium Footage"). (*Id*. at PageID# 1430.) In addition, she identifies the video entitled "Copy of Door 24- In front of Gym" as a true and accurate copy of video of the door exiting the gym and the hallway directly outside that door (hereinafter "Pep Rally Gym Door/Hall Footage"). (*Id*. at PageID#s 1429-1430.)

her anxiety under control. However, at the approximately 14:45 mark, the video shows Shrader leading her students out of the pep rally towards and then through the main gym door. (*Id*. at 14:45 to 15:44.)

The Pep Rally Gym Door/Hall Footage is video of the main doorway area to the gym. *See* Pep Rally Gym Door/Hall Footage. The footage is just over an hour in length and shows the main gym door, the hall directly outside of it, and a narrower hallway along the length of the gym. (*Id.*) The video shows Oberhauser going into the gym at the :24 mark, coming back out and standing in the hallway at the 12:27 mark, and then going back into the gym at the 13:13 mark. (*Id.* at :24 through 13:13.) At approximately the 24:21 mark, the video shows Shrader entering the gym with her students through the main door. (*Id*. at 24:21.) This footage does not clearly show Shrader leaving the gym to go to Talkington's room. However, it does show her return to the gym through the main door with Talkington at the 35:53 mark. (*Id*. at 35:53.) The video then shows Oberhauser exit the gym through the main door at approximately the 58:24 mark. (*Id.* at 58:24.) He can then be seen hovering near the main doorway, as students are being led out of the gym back to their classrooms. (*Id*. at 58:24 to 59:18.) At the 59:18 mark, the video shows Shrader exiting the gym through the main door with her students. (*Id*. at 59:18.) Shrader and Oberhauser are in close proximity as she leaves the gym but they do not appear to directly interact, i.e., they do not appear to speak to each other or touch one another. (*Id*.) Oberhauser then re-enters the gym at the 59:26 mark and then exits at the 1:00 mark and leaves the area. (*Id*. at 59:26 to 1:00.)

Shrader asked her union representative, Ms. Talkington, to report the October 2023 Pep Rally Incident to administration. (Shrader Depo. at Tr. 48.) Talkington first advised union president, Alice Johnston, of Shrader's concerns. (Johnston Depo. at Tr. 22.) On October 25, 2023, Johnston emailed

Blair and Salvino to "touch base about what happened at the middle school the other day between" Shrader and Oberhauser. (Doc. No. 42-40 at PageID# 1651; Blair Depo. at Tr. 31-32.) Blair subsequently spoke with Johnston, who gave Blair a "heads-up" that Shrader was uncomfortable with what had occurred at the pep rally. (Blair Depo. at Tr. 32.) Meanwhile, on October 26, 2023, Talkington emailed Principals Smith and Carr and asked to "sit down and discuss the incident that took place during the MIS Pep Rally." (Talkington Depo. at Tr. 49; Doc. No. 42-27 at PageID# 1566.)

Oberhauser testified that nobody from the administration or the union talked to him about the pep rally, although he did learn that Shrader had filed a complaint against him. (Oberhauser Depo. at Tr. 38-39, 56, 59.)

**2. The November 2023 Walkabout**

The October 20, 2023 Pep Rally Incident was quickly followed by another incident involving Shrader and Oberhauser. On November 3, 2023, Oberhauser walked his seventh-grade students past Shrader's fifth grade classroom in the MIS (hereinafter "the November 2023 Walkabout"). (Oberhauser Depo. at Tr. 39-40.) Oberhauser testified that he took his students on a walk to the MIS "just to show them my old classroom, and it wasn't nothing for me to take the kids for a walk within the building." (*Id*. at Tr. 40.) He testified that, at the time, he "had no idea" that he had walked his students past Shrader's classroom. (*Id*. at Tr. 40-41.) Oberhauser explained that, when he was taking his students for a walk, it occurred to him that he should stay away from Shrader but he mistakenly believed that Shrader's classroom was in a different area of the MIS. (*Id.* at Tr. 77-78, 96.)

Shrader testified that she did not see Oberhauser during his "walkabout" but that he "got the attention of" her students, who "were all screaming his name." (Shrader Depo. at Tr. 67.) Shrader

testified that this caused her to have anxiety.[16] (*Id.*) While Shrader acknowledged that Oberhauser had not talked to her, called her, emailed her, or physically threatened her during the 2023-2024 school year, she nonetheless felt that he was harassing and stalking her.[17] (*Id.* at Tr. 70.) Shrader reported Oberhauser's November 2023 Walkabout to Principal Smith. (Smith Depo. at Tr. 13-14; Shrader Depo. at Tr. 87-88.) It appears that Smith then reported the matter to Blair, who discussed it with Superintendent Salvino. (Salvino Depo. at Tr. 35-36, 54-55.)

On November 8, 2023, Talkington and union representative Antoinette Remenaric met with Smith and Carr to discuss Shrader's concerns regarding the October 2023 Pep Rally Incident and the November 2023 Walkabout. (Talkington Depo. at Tr. 50.) During that meeting, Talkington informed Smith and Carr that Shrader had had a physical reaction to seeing Oberhauser at the Pep Rally and requested that they discuss modifying an existing plan or implementing a new one to ensure that Shrader felt safe in the workplace. (Blair Depo. at Tr. 32-33; Carr Depo. at Tr. 37-38; Deposition of Antoinette Remenaric (Doc. No. 31-1) at Tr. 9, 10-11; Doc. No. 42-15 at PageID# 1541.)

On November 9, 2023, Shrader's counsel, Attorney John Myers, sent a letter to Salvino. (Salvino Depo. at Tr. 46-47; Doc. No. 42-47.) Therein, Attorney Myers advised that "Mrs. Shrader

---

[16] Talkington testified that Shrader came to her about the November 2023 Walkabout Incident. (Talkington Depo. at Tr. 57.) Talkington testified that Shrader was "concerned" and "taken aback" because "that's not something she expected, that she would be in her room and having her students let her know that [Oberhauser] was walking by." (*Id.*)

[17] Defendant submitted video footage of the November 2023 Walkabout through the hallway outside Shrader's classroom. In her Affidavit, Blair identifies the video titled " 6th Grade South – 110323.mp4" as a true and accurate copy of video of the hallway outside Shrader's classroom on November 3, 2023 (hereinafter "the Walkabout Video"). (Blair Aff. (Doc. No. 39-29) at PageID# 1430.) This video shows a hallway with lockers on each side, as well as doorways leading to classrooms on the left and right. A stairwell is located at the far end of the hallway. Beginning at 1:15 on the video, Oberhauser and his students can be seen climbing the stairwell and assembling at the far end of the hallway. Oberhauser then leads his students down the hallway, first pointing to a classroom on the left side of the hallway and then pointing to a classroom on the right side of the hallway. His students can be seen waving, smiling, and laughing as they progress down the hallway. By 2:08 on the video, Oberhauser and his students are no longer in the hallway. Shrader does not appear at any point in this video.

is concerned that Guy Oberhauser is engaging in further acts of retaliation against her on account of her prior complaints about his treatment of her in the workplace." (Doc. No. 42-47 at PageID# 1672.) Attorney Myers raised the October 2023 Pep Rally Incident and suggested that Oberhauser's conduct "may have run afoul of the [September 2022] MOU." (*Id.*) Attorney Myers also discussed the November 2023 Walkabout and indicated that "Mr. Oberhauser's actions do not appear to be innocent or unintentional." (*Id*. at PageID# 1673.) Attorney Myers concluded by stating that "if this matter cannot be resolved, Mrs. Shrader may be forced to seek a civil protective order and to take further action, outside the union process, to ensure that Mr. Oberhauser ceases and desists his harassment and intimidation." (*Id.*)

When Salvino received this letter, he thought "well, here we go." (Salvino Depo. at Tr. 47.) Salvino testified that he spoke with MJHS Principal Carr. (*Id*. at Tr. 55.) Salvino recounted this conversation as follows:

> I called Mr. Carr, and I said, explain this to me. Is this normal? Do you have current junior high teachers walking kids, their classes, to the intermediate side of the building. He said, no, sir. I said, then you need to have a verbal con -- conversation with Mr. Oberhauser. Tell him it ends. Never again. You are done. Don't leave the junior high side of the building with your class. There's no reason. If you need to go on a walk, go outside.

(*Id.*) Carr spoke with Oberhauser and told him not to go past Shrader's classroom anymore. (Carr Depo. at Tr. 17, 24-25; Oberhauser Depo. at Tr. 41-42; Blair Depo. at Tr. 46.) Carr testified that Oberhauser was receptive but that he felt that Oberhauser "was a little agitated that this kept going on."[18] (Carr Depo. at Tr. 18.) Oberhauser testified that, since his conversation with Carr, he has not walked his students through any part of the MIS. (Oberhauser Depo. at Tr. 42.)

---

[18] Carr testified that, at some point subsequently, he became aware that another seventh-grade teacher, Dan Ruffner, had started walking his students past Shrader's classroom. (Carr Depo. at Tr. 21-22.) *See also* Talkington Depo. at Tr. 56-

Meanwhile, on November 10, 2023, Shrader (through Talkington) filed a grievance against Blair regarding the October 2023 Pep Rally Incident and the November 2023 Walkabout. (Blair Depo. at Tr. 35.) The basis of the grievance was the District's alleged failure to manage the workforce.[19] (Talkington Depo. at Tr. 18, 57-58.) Specifically, Talkington testified that Shrader filed this grievance because she "believe[d] it was a form of retaliation for not having the forethought to make another plan for [Shrader] or not having the forethought of, you know, letting [Shrader] know, giving her heads-up" that Oberhauser would be emceeing the pep rally. (*Id.*) According to Shrader, both Smith and Blair "were privileged to know that there [were] incidents between Mr. Oberhauser and myself, knowing that I had anxiety over Mr. Oberhauser" such that they should "have given me the heads up that ... he was emceeing." (Shrader Depo. at Tr. 50-51, 52, 54.) In essence, Shrader testified, she filed a grievance because Oberhauser "again, was doing the exact same behavior" as in the 2020- 2021 school year. (*Id.* at Tr. 60-61.)

Grievance meetings were held between administration and union representatives on November 13 and December 13, 2023 (Levels 1 and 2, respectively) and on January 10, 2024 (Level 3). (Blair Depo. at Tr. 13-14, 35-36; Doc. No. 39-4 at PageID#s 1307-1309; Talkington Depo. at Tr. 45-48.) During these meetings, there were discussions regarding whether the 2021 Plan was still

---

57; Doc. No. 42-24 at PageID# 1563; Shrader Depo. at Tr. 63-64; Doc. No. 42-5 at PageID#s 1504-505. Ruffner is a close friend and colleague of Oberhauser. (Oberhauser Depo. at Tr. 42.) According to Shrader, Oberhauser persuaded Ruffner to walk past her classroom in order to harass and torment her. (Shrader Depo. at Tr. 63-64; Doc. No. 42-5 at PageID#s 1504-1505.) Oberhauser testified that he was not aware that Ruffner had started walking his students around Shrader's classroom. (Oberhauser Depo. at Tr. 43-44.) Carr advised Ruffner not to walk his students around the middle school. (Carr Depo. at Tr. 24-25.)

[19] Under the Master Agreement between the MCSD and the MEA (hereinafter the "collective bargaining agreement" or "CBA"), the District is responsible for (among other things): (1) directing, supervising, evaluating and hiring employees (Section 2.032); (2) suspending, disciplining, demoting, or discharging employees for just cause (Section 2.035); and (3) effectively managing the work force (Section 2.038). (Salvino Depo. at Tr. 8, 55-56; Doc. No. 43-1 at PageID#s1760-1761; Johnston Depo. at Tr. 40.)

viable. (Blair Depo. at Tr. 37.) According to Blair, it was decided that the 2021 Plan "no longer fit the situation because [Shrader and Oberhauser were now] in two different buildings on two different schedules." (*Id.*) *See also* Talkington Depo. at Tr. 21-22. The participants also discussed adding "something additional" to the September 2022 MOU. (Blair Depo. at Tr. 37.) Blair testified that "there was a draft of a .... potential plan" but that "it never came to fruition." (*Id.*) *See also* Talkington Depo. at Tr. 24, 45-46, 59. Blair explained that "communications broke down" going into the Level 3 Meeting on January 10, 2024 because "we could not come up with a proper resolution." (Blair Depo. at Tr. 38-40.) Shrader's grievance was ultimately denied at each level. (*Id.* at Tr. 35-36; Talkington Depo. at Tr. 47.)[20]

**3. The Ice Cream Social**

Shrader and Oberhauser soon crossed paths again. On January 18, 2024, an ice cream social for fifth grade students was held in the Middle School Complex cafeteria. (Blair Depo. at Tr. 13-14; Doc. No. 39-4 at PageID# 1309; Talkington Depo. at Tr. 23.) Shrader was present at the event with her students. (Shrader Depo. at Tr. 78-79.) Oberhauser entered the cafeteria with his friend and fellow seventh grade teacher, Dan Ruffner.[21] (Oberhauser Depo. at Tr. 45-46.) He testified that, once he was in the cafeteria, he realized that Shrader was there. (*Id.* at Tr. 46.) Oberhauser testified that he "immediately turned around and started towards the other door to exit the area" because he

---

[20] Meanwhile, on December 11, 2023, Shrader filed a Charge of Discrimination with the EEOC. (Doc. No. 42-50 at PageID#s 1679-1681.) Therein, she alleged that the "Massillon City Schools has fostered and condoned the retaliatory conduct of Mr. Oberhauser and have separately retaliated against Mrs. Shrader on account of her October 20, 2023 complaint of retaliation as well as her prior protected activity in the form of complaints to the Massillon City Schools Administrators and her prior EEOC charges of discrimination setting forth Mr. Oberhauser's discriminatory and retaliatory conduct." (*Id.* at PageID# 1681.)

[21] Oberhauser testified that Mr. Ruffner's wife, Jamie Ruffner, was a fifth grade teacher at the time and that he and Ruffner went to the ice cream social to talk to her. (Oberhauser Depo. at Tr. 44-45.)

knew that he should not come into contact with Shrader. (*Id.*) The Court will refer to this as the "Ice Cream Social Incident."

Shrader testified that she was absolutely certain that Oberhauser came to the ice cream social knowing that she would be there with the intention of causing her anxiety. (Shrader Depo. at Tr. 78-80.) She testified as follows:

> A: *** I have said all along, [Oberhauser] is there because this is his MO. This is what [Oberhauser] does to get to me. He caused me anxiety. He looked at me. He left.
>
> Q: And you looked at him and you made eye contact, right?
>
> A: ** I would have had an anxiety attack, because I didn't know he was going to be there. A student got my attention to stop my anxiety attack. Because I -- I started to breathe, use my techniques that I have been taught. Otherwise I think I would have gone into a full-blown anxiety attack.

(*Id.*)[22] After the ice cream social, Shrader had an "extremely bad migraine" and "was extremely sick." (Doc. No. 42-5 at PageID# 1506; Shrader Depo. at Tr. 63.)

---

[22] In a subsequent, written summary of this incident, Shrader wrote: "This was a reward ice cream social event for 5th grade students only and 5th grade teachers. I was celebrating with my students and having a fun afternoon until all of a sudden I saw Mr. Oberhauser from across the room socializing with my 5th graders. I immediately freeze in my spot. I am paralyzed, and my body can't move. I begin to panic because I don't have an exit strategy since I am in the cafeteria. I can't believe this is happening. I am not sure what to do and I don't want to have an anxiety attack in front of my students or cry in front of them. A student, [JW], comes up to me to tell me that girls are fighting. [JW] has to tell me several times to the point where she is yelling at me to ask if I am listening to her because I am almost in a trance because of Mr. Oberhauser. I snap out of it at this point and walk over to where [JW] take [sic] me to the girls who are arguing. At this time I focus on the situation at hand and handle the situation with the girls. By the time I was done, Mr. Oberhauser had left. It was the end of the school day and I was still upset over the situation and reported it to my lawyer and union representative, Andrea Talkington. I had an extremely bad migraine by the time I left work and was extremely sick. I left a message for my lawyer which is documented in an email. I was going to call off work the next day due to being sick over the situation, but we had a snow day." (Doc. No. 42-5 at PageID#s 1505-1506) (authenticated at Shrader Depo. at Tr. 63.)

Video footage of the ice cream social[23] shows that Shrader entered the ice cream social with her students first (i.e., before Oberhauser). She spends much of the time helping her students get their bowls of ice cream, directing them to cafeteria tables to sit and eat, talking with students and other teachers, and generally monitoring and overseeing the students. (Cafeteria Food Line Video from 20:00 to 33:00.) Shrader largely stays either in the middle of or on the right hand side of the cafeteria (as viewed from the perspective of the Cafeteria Food Line Video). (*Id.*) At approximately the 33:08 mark on the Cafeteria Food Line video, Shrader can be seen moving to the very front of the cafeteria (i.e., the wall along which the food line is set up) on the right side, where she stands near or behind one of the farthest most ice cream tables on the right. (*Id.* at 33:08.) At approximately the 36:00 mark, Ruffner enters the cafeteria from the front left, wearing a short sleeved striped shirt and dark pants. (*Id.* at 36:00.) Shortly thereafter, at approximately the 36:08 mark, Oberhauser appears in the video. (*Id.* at 36:08.) He can be seen walking among the cafeteria tables on the left-hand side, stopping to talk to some students. (*Id.* at 36:08 to 36:30.) Ruffner then walks over to Oberhauser and the two of them proceed to walk through the table area on the left side, towards the left back of the cafeteria. (*Id.* at 36:30 to 38:00.) Oberhauser is seen leaving the cafeteria through a door at the back left of the cafeteria at approximately the 38:00 mark. i.e., approximately two minutes after entering the ice cream social. (*Id.* at 38:00.)

---

[23] Defendant submitted two videos of the ice cream social, both of which were authenticated by Blair. (Doc. No. 39-29 at PageID#s 1430-1431.) The first video is titled "Copy of Copy of Copy of Cafeteria at foodline.mp4" (hereinafter "Cafeteria Food Line Video"). The camera is located at or near the cafeteria ceiling, in the center of the wall along which tables have been set up with ice cream, bowls, etc. (hereinafter referred to as "the front wall"). The second video is titled "Copy of Copy of Copy of Café looking South.mp4" (hereafter "Cafeteria Looking South Video"). The camera in this video is likewise located at or near the ceiling but is in the center of the wall directly opposite the food line (hereinafter referred to as "the back wall"). In sum, both videos provide birds eye views of the ice cream social but are from opposite ends of the cafeteria.

Once Ruffner and Oberhauser enter the cafeteria, Shrader initially stays in the right, front area of the cafeteria, just next to the farthest right ice cream table. (*Id.* at 36:00.) At approximately the 37:01 mark (as Ruffner and Oberhauser are walking through the cafeteria tables on the left hand side), Shrader begins to slowly walk down the right hand side of the cafeteria. (*Id*. at 37:01 to 37:23.) At approximately the 37:23 mark, Shrader can be seen talking to a female student and then following that student towards a table in the back right of the cafeteria. (*Id.* at 37:23.) Shrader remains in the back, right area of the cafeteria talking to a group of female students, while Oberhauser can be seen making his way down the far-left side of the cafeteria and ultimately leaving the ice cream social at the 38:00 mark. (*Id.* at 37:23 to 38:00.)

The Cafeteria Looking South Video shows the same activity but from a different angle, i.e., from the back wall of the cafeteria.[24] At no point in either the Cafeteria Food Line Video or the Cafeteria Looking South Video do Shrader and Oberhauser speak to each other and/or come in close proximity to each other**.**

On January 18, 2024, Talkington sent a lengthy email to (among others) Salvino, Fortner, Blair, and Smith. (Doc. No. 39-8.) Therein, Talkington reported that "while Mrs. Shrader was in the cafeteria with her students, she noticed that Mr. Oberhauser and another seventh-grade teacher walking around and interacting with fifth grade students." (*Id*. at PageID# 1338.) Talkington then summarized the October 2023 Pep Rally Incident and November 2023 Walkabout and referenced the

[24] From this angle, Shrader can be seen entering the cafeteria from the far-left door at approximately 13:00 on the video. Oberhauser and Ruffner enter the cafeteria together through the far-right door at the 29:58 mark. At this time, Shrader is standing on the other side of the cafeteria, i.e., on the far left, standing behind an ice cream table. Oberhauser and Ruffner stay on the right area of the cafeteria and proceed to slowly make their way towards the back right exit door. Shrader remains in place until approximately 31:50 on the video, at which time she walks to the back left area of the cafeteria. At 32:15 on the video, Oberhauser disappears from view.

then-ongoing grievance process resulting from those incidents.[25] (*Id.*) Talkington made a public records request for the camera footage of the ice cream social and concluded as follows:

> It is very troubling that these incidents are still allowed to occur even after the administration was informed. Why is the administration allowing Mr. Oberhauser to attend a fifth grade sponsored event during the school day [?] Why is the administration allowing Mr. Oberhauser to harass, intimidate, and stalk Mrs. Shrader [?] When is the administration going to provide an environment that is safe and free of harassment and intimidation for Mrs. Shrader?

(*Id*. at PageID#s 1338-1339.)

Salvino testified that, after the ice cream social incident, "it was clear to [him] that [Oberhauser] was being a jerk." (Salvino Depo. at Tr. 61.) Soon after, Carr gave both Oberhauser and Ruffner verbal warnings "because they left the areas that they were supposed to be supervising to walk down" to the ice cream social. (Carr Depo. at Tr. 18-19; Blair Depo. at Tr. 46-48.) Carr testified that Oberhauser and Ruffner were both "receptive" to this warning. (*Id*. at Tr. 19-20.)

### D. Shrader Files a Grievance, two Title VII Complaints, and a Police Report; and Oberhauser files a Title VII Complaint against Shrader

On January 22, 2024, Blair emailed Shrader to inquire whether she wanted to file a "formal/informal complaint" under Board Policy 3362. (Doc. No. 42-44 at PageID# 1658; Doc. No. 39-11 at PageID# 1345.) Board Policy 3362 is the District's internal anti-harassment policy. (Blair Depo. at Tr. 7; Doc. No. 42-54 at PageID#s 1696-1707.) Blair testified that Board Policy 3362 encompasses Title VII. (Blair Depo. at Tr. 7.)

---

[25] Talkington also referenced several other incidents, as follows: "First, Mr. Oberhauser was seen in the fourth grade team lounge making copies even though there were at least five other copiers available to use. Next, Mrs. Shrader encountered Mr. Oberhauser after she attended the Christmas Choir event in the cafeteria after school. Then, this same seventh grade teacher from today [i.e., Mr. Ruffner] has been seen on several occasions walking his students by Mrs. Shrader's room. In fact, he walked his students by Mrs. Shrader's room today around 10:02 and passed her in the hallway. It should be noted that [Ruffner's] classroom is on the first floor of the MJHS. [Ruffner] was never seen walking his students by Mrs. Shrader's room before Mr. Oberhauser was told to stop." (Doc. No. 39-8 at PageID# 1338.)

Shrader responded as follows. First, on January 25, 2024, Shrader filed a grievance against Salvino related to the Ice Cream Social Incident. (Doc. No. 39-9 at PageID#s 1340-1342; Doc. No. 42-62 at PageID# 1715.) Therein, Shrader alleged that Salvino had violated several provisions of the CBA, including Article 2.038 which requires the administration to effectively manage the workforce. (Doc. No. 39-9 at PageID# 1342.) *See also* Blair Depo. at Tr. 43.

Second, and also on January 25, 2024, Shrader filed formal complaints against both Salvino and Oberhauser under Board Policy 3362. (Doc. No. 42-58 at PageID# 1711; Doc. No. 42-60 at PageID# 1713.) Talkington emailed Blair to notify her that these formal complaints had been filed. (*Id.*) In her emails, Talkington asserted that Salvino's and Oberhauser's behavior "is severe and pervasive enough that it has created an intimidating, hostile, and offensive work environment" and has "caused Mrs. Shrader severe discomfort, humiliation, and has interfered with her work performance and participation." (*Id.*) Talkington further asserted that Salvino and Oberhauser were retaliating against Shrader for her previous grievances, complaints, and lawsuit. (*Id.*) *See also* Talkington Depo. at Tr. 66-67; Blair Depo. at Tr. 43-44. Lastly, Talkington indicated that "Mrs. Shrader is requesting that an outside investigator not affiliated with the Massillon City School district conduct this Formal Complaint." (Doc. No. 42-58 at PageID# 1711.) Blair met separately with Salvino and Oberhauser on January 26, 2024 to notify them of Shrader's complaints. (Blair Depo. at Tr. 44-45.)

Third, on January 30, 2024, Shrader filed a police report with the Massillon City Police Department ("MCPD") against Oberhauser for menacing by stalking. (Shrader Depo. at Tr. 93.) She explained her reasons for filing this report, as follows:

> Q: Okay. Why did you believe -- and I know you started to tell me this earlier -- this was stalking by menacing?

> A: Menacing by stalking, yes. *** So you, by law, when you look it up, you don't have to -- harassment, stalking, you don't have to make physical contact with somebody. You don't have to e-mail them. You don't have to make a conversation. You have to deliberately keep being in violation of somebody with repeated behavior. And I believe that he keeps doing the exact same behavior, knowing that he has been told it causes me anxiety. So I believe that Mr. Oberhauser is doing this with the intentional purpose that he knows it intentionally -- he's going to get to me, when I'm effectively teaching my job, to come to my space, to intentionally harass and to stalk me.
>
> When I believe that the district wasn't helping me effectively and efficiently, after I have told the district, listen, please help me, I don't feel safe by this, I went to the Massillon Police Department.

(*Id*. at 94-95.) Talkington encouraged Shrader to file a police report and accompanied her to the station.[26] (Talkington Depo. at Tr. 68-71.) Talkington testified that, while they were at the police station, Shrader had an anxiety attack, i.e., she "got physically ill again, because she was under distress, because she just wanted it to stop." (*Id*. at Tr. 71.)

A MCPD detective ("Detective Dadisman") subsequently contacted MCSD Safety and Security Coordinator Jamey Palma. (Deposition of J. Palma (Doc. No. 30-1) at Tr. 7-8.) Palma, Carr, and Smith subsequently had a telephone call with the MCPD. (Carr Depo. at Tr. 27.) Detective Dadisman notified them that Shrader had made a complaint that Oberhauser had been harassing her. (*Id*.) According to Palma, Detective Dadisman "reached out to [the District] to get some context." (*Id*. at Tr. 8.) Palma advised Detective Dadisman that "we were in a Title VII investigation," provided some background information about Shrader's Title VII complaint, and indicated that there was "a plan in place" to keep Shrader and Oberhauser apart. (*Id*. at Tr. 8, 12.) Palma asked Detective

---

[26] Talkington testified that she first spoke to Principal Carr to advise him that Shrader was planning on filing a police report. (*Id*. at Tr. 68.) According to Talkington, Carr indicated that he wished that Shrader did not file a police report. (*Id*. at Tr. 69.) Talkington testified that she then spoke to a school resource officer, who told Talkington to "just go right to the police department." (*Id*. at Tr. 69-70.)

Dadisman whether the District needed to "stand down" on its Title VII investigation in light of Shrader's police report. (*Id*. at Tr. 8.) According to Palma, Detective Dadisman replied in the negative, allegedly explaining that Oberhauser's alleged conduct was "not criminal."[27] (*Id*.)

The MCPD also contacted Oberhauser. (Oberhauser Depo. at Tr. 50.) Specifically, Oberhauser testified that a MCPD detective called him and advised him that Shrader had filed a police report. (*Id*.) According to Oberhauser, the detective indicated that Shrader's complaint "was a district thing" but nonetheless advised Oberhauser to "try to avoid" Shrader. (*Id*.) Oberhauser testified that he was irritated at this point and "just fed up" because he "didn't realize it was a big deal" or that Shrader "still had such a concern about it." (*Id*. at Tr. 50-51.)

On February 2, 2024, Oberhauser filed a Title VII Complaint against Shrader. (Oberhauser Depo. at Tr. 51-55; Doc. No. 42-28.) Therein, Oberhauser asserted (in relevant part) as follows:

> As an employee within the Massillon City Schools, I have experienced ongoing emotional distress due to Mrs. Shrader's behavior, which has created an intimidating and unnerving work environment for me.
>
> Mrs. Shrader's unfounded accusations against me have resulted in biased treatment from colleagues and has negatively impacted my professional relationships within the workplace. Despite my return to the MMS complex, I have consistently maintained a respectful and professional demeanor, refraining from any actions or statements that could cause harm to Mrs. Shrader. However, she continues to make baseless accusations without providing any evidence, thereby tarnishing my character.
>
> I am concerned that Mrs. Shrader's actions may be influenced by retaliation due to previous events [from] four years ago. This creates an unfair and discriminatory work environment, which is in violation of Title VII.

(*Id.*) Oberhauser testified that, when he came back to the MJHS, he believed that "it was all over and done with" but that "every time [he] would see [her] in the hall or something, it was turned into a

---

[27] Blair testified that, on or around January 31, 2024, the district "received word from [the MCPD] that no charges were filed" as a result of Shrader's complaint. (Blair Depo. at Tr. 54-55.)

bigger issue than it needed to be." (Oberhauser Depo. at Tr. 62.) He testified that Shrader's complaints "brought a lot of stress into [his] personal life" and his teaching, and that he felt that Shrader's police report was "unjust." (*Id.* at Tr. 55, 61.)

### E. The District implements Interim Supportive Measures and refers the matter to external investigator David Morgan

On February 7, 2024, Blair conducted separate intake meetings with Shrader and Oberhauser regarding their respective Title VII Complaints against each other. (Blair Depo. at Tr. 57-63; Doc. Nos. 42-51, 42-53.) Blair testified that, during these intake meetings, she asked both Shrader and Oberhauser "what would be helpful" in terms of "supportive measures" that could be put in place at that time. (Blair Depo. at Tr. 60-61.) Blair testified that Shrader (and Talkington, who was also present at the intake meeting) provided "input." (*Id.* at Tr. 61.)

On February 8, 2024, Blair sent emails to Oberhauser, Shrader, Smith, and Carr, in which she indicated that the District was instituting "Interim Supportive Measures" pending the outcome of the investigation into Shrader and Oberhauser's Title VII complaints. (Doc. Nos. 42-8, 42-26.) Specifically, Blair wrote (in relevant part) as follows:

> This Contact Restriction is not disciplinary and applies equally to both parties involved. The District has made no findings regarding the alleged conduct at this time. However, based on the nature of the allegations, it is determined that these interim supportive measures are appropriate during the investigative phase.
>
> • Guy Oberhauser and Monica Shrader are being instructed to not make intentional contact with one another. Mr. Oberhauser will not attend any Massillon Intermediate specific school events and Mrs. Shrader will not attend any Massillon Junior High events.
>
> • Mr. Oberhauser will stay out of the Massillon Intermediate School areas unless there is an emergency. This excludes the Massillon Intermediate School administrative offices.

> • Mrs. Shrader will stay out of the Massillon Junior High School areas unless there is an emergency. This excludes the Massillon Junior High School administrative offices and Mrs. Talkington's classroom (room 800).
>
> • Both parties, if they see one another, will immediately turn around and find an alternative route. (This excludes emergency situations).
>
> It is the responsibility of both Monica Shrader and Guy Oberhauser to refrain from making intentional contact with one another. If this Mutual Contact Restriction should be violated by either party at any time during the investigation, the parties should contact building administration and Tille VII compliance officer(s).

(Doc. No. 42-8, Doc. No. 42-26.) *See also* Blair Depo. at Tr. 65-68; Shrader Depo. at Tr. 115. Shrader testified that she was "perplexed" about "why [she] was getting treated the same way" as Oberhauser, stating that she "didn't feel like [she] needed to be put on the plan." (Shrader Depo. at Tr. 117.)

The MCSD decided to refer the investigation into Shrader and Oberhauser's Title VII Complaints to an external investigator.[28] (Blair Depo. at Tr. 63-64; Salvino Depo. at Tr. 74-75.) Salvino decided to use David Morgan of TMD Security Consulting Litigation Services as the external investigator. (Blair Depo. at Tr. 63-64; Salvino Depo. at Tr. 75-76.) Salvino testified that he became aware of Mr. Morgan through a referral from the Educational Service Center of Stark County (hereinafter "Stark County ESC"). (*Id.*) Salvino testified that, prior to the investigation, he "knew of" Mr. Morgan, i.e., he knew that Morgan was a former FBI agent that had since retired and that he was doing "local school district investigations" under Titles VII and IX. (Salvino Depo. at Tr. 75.)

---

[28] When asked why the District decided to use an external investigator, Salvino testified as follows: "Well, you had one member [i.e., Shrader] who demanded it be a third party, no one tied to anyone in regards to this topic, not knowing any past history of these individuals that were filing the complaint, as well as -- and then we had one member [i.e., Oberhauser] who stated I demand Massillon City School's administration complete that. So I wanted -- because this was yet another issue that we were dealing with regarding Monica Shrader and Guy Oberhauser, that we were going to make sure T's were crossed, I's were dotted. I was a person that received a complaint as well. So to be completely unbiased, we brought in a third party." (Salvino Depo. at Tr. 74-75.)

The MCSD retained Mr. Morgan on February 21, 2024. (Salvino Depo. at Tr. 76; Doc. No. 42-64; Deposition of D. Morgan (Doc. No. 29-1) at Tr. 12-13; Doc. No. 42-39.) Morgan's primary contact was Blair. (Salvino Depo. at Tr. 77; Morgan Deposition at Tr. 8.) As part of his investigation, Morgan interviewed the following individuals: (1) Shrader; (2) Oberhauser; (3) Superintendent Salvino; (4) Dan Ruffner; (5) Jamie Ruffner (i.e., Dan Ruffner's wife); (6) Talkington; (7) Kelsey Spino; (8) Principal Smith; (9) Principal Carr; (10) Johnston; and (11) Remenaric. (Doc. No. 42-39 at PageID#s 1609-1610.) In addition, Morgan reviewed a timeline and impact statement prepared by Shrader, as well as video footage of the October 2023 Pep Rally Incident, November 2023 Walkabout, and January 2024 Ice Cream Social.[29] (*Id.* at PageID#s 1624-1625.)

Morgan issued his Report on May 8, 2024. (Doc. No. 42-39; Morgan Depo. at Tr. 12-13.) After summarizing the disputed and undisputed facts (including summaries of his interviews with the above witnesses), Morgan concluded as follows. Morgan first found that, "based on a preponderance of the evidence, [] Oberhauser is not responsible and did not violate [MSCSD] Policy 3362." (Doc. No. 42-39 at PageID# 1626.) Specifically, Morgan concluded that "[f]or the 2023-2024 school year, the investigation found no evidence that Oberhauser was under any sort of plan or restriction with respect to Shrader." (*Id.*) He determined that Oberhauser's actions during the pep rally were "a) not planned to affect Shrader and b) did not harass her." (*Id.*) In this regard, Morgan noted that "Shrader did not allege that Oberhauser made any verbal or physical threats towards her other than, in Shrader's opinion, looking past [Kelsey] Spino towards Shrader." (*Id.* at PageID# 1627.) Regarding the November 2023 Walkabout, Morgan found that Oberhauser's actions were inappropriate but that "the

[29] Meanwhile, on March 29, 2024, Shrader field an Amended EEOC Charge against the MCSD for retaliation. (Doc. No. 42-68.)

evidence suggests that he did not have any interaction with Shrader on this occasion." (*Id.*) And, regarding the Ice Cream Social Incident, Morgan found that Oberhauser did not harass Shrader because "witness interviews and a review of the surveillance video show that Oberhauser had no contact with Shrader during the event." (*Id.*) Lastly, Morgan found that the investigation "also did not find evidence to support harassment by stalking." (*Id.*)

Morgan next found that "based on a preponderance of the evidence, [] Salvino is not responsible and did not violate [MSCSD] Policy 3362." (*Id.* at PageID# 1628.) He concluded as follows:

> The evidence suggests that during the summer of 2023, Salvino was aware there could be a problem between Oberhauser and Shrader. In fact, he called Johnston to discuss the situation. Both Salvino and Johnston agreed that Oberhauser had the right to bid on the Junior High position and that no plan or restrictions were placed on Oberhauser for the 2023-2024 school year. During the summer of 2023, Salvino reported that his primary concern was to avoid being the reason for a new conflict between Oberhauser and Shrader. He feared that had he implemented a new plan or had discussions with the parties in advance of a complaint, that in and of itself could have caused a problem. Johnston echoed this point when she opined that putting a plan in place before adverse interactions between Shrader and Oberhauser could have also generated complaints against the District.
>
> Importantly, Shrader admitted she knew that Oberhauser was moving to the Junior High prior to the 2023 convocation. However, prior to November 2023, Schrader did not communicate to Smith or any other administrator her concerns about being near Oberhauser despite being required to do so by the collective bargaining agreement. Thus, based on a preponderance of evidence, the investigation finds that Salvino did not create nor allow Oberhauser to create a hostile environment for Shrader.

(*Id.*) Lastly, Morgan found that "based on a preponderance of the evidence, [] Shrader is not responsible and did not violate [MSCSD] Policy 3362." (*Id.* at PageID# 1629-1630.) Specifically, Morgan determined as follows:

> This investigation found that Oberhauser did not harass Shrader during the 2023-2024 school year and found no evidence to support the filing of the criminal complaint against Oberhauser. While filing a criminal complaint with local law enforcement is

> within any citizen's rights, in this matter the evidence suggests that Shrader's complaint of menacing by stalking was based solely on allegations and perceptions within the context of Shrader and Oberhauser's employment within the District. Moreover, based on the staff's collective bargaining agreement, Shrader had a responsibility to report concerns that occurred within the District to the building principal. There is no evidence that Shrader ever reported to the District that Oberhauser was stalking her in violation of criminal law. However, while filing the criminal complaint with law enforcement came perilously close to tripping the balance of "threatening, insulting, or dehumanizing gesture, ... that is severe or pervasive enough to create an intimidating, hostile, or offensive educational or work environment," this investigation finds insufficient evidence to conclude that Shrader harassed Oberhauser.

(*Id.*) Morgan then provided the following three recommendations "to avoid future conflict": (1) MCSD "should implement guidelines for each party to avoid interaction with the other party;"[30] (2) "all parties should improve communication between themselves and the District;" and (3) MCSD "should develop plans for district-wide service events to minimize contact between the parties." (*Id.* at PageID#s 1630-1631.)

On May 23, 2024, Shrader sent an email to Blair, in which she objected to Morgan's Report on numerous grounds. (Shrader Depo. at Tr. 127; Doc. No. 42-13 at PageID#s 1533-1536.) Shrader first asserted that Morgan was "biased and impartial." (Doc. No. 42-13.) She maintained that Morgan and Salvino had "personally work[ed] together in the Jackson City School District" and that Salvino had been Morgan's daughter's principal. (*Id.*) Shrader next argued that Morgan was condescending and kept "getting frustrated because [she] wasn't answering the way he wanted the answers to fit his narrative." (*Id.*) Shrader further asserted that Morgan insulted one of her witnesses (Stephanie Hathaway) and failed to interview several of her "teacher witnesses." (*Id.*) Shrader strongly

[30] Specifically, Morgan recommended as follows: "Oberhauser should refrain from visiting the Intermediate School and avoid contact with Shrader, and Shrader should also refrain from visiting the Junior High School and avoid contact with Oberhauser. Moreover, it is reasonable for each party to limit their time in the mailroom to avoid contact with the other party." (*Id.* at PageID# 1630.)

disagreed with Morgan's conclusion that her police report "came perilously close" to creating a hostile work environment for Oberhauser, complaining that "the implication is that I was engaged in conduct that was violating policy, while Oberhauser was permitted to engage in conduct with impunity after he returned to the junior high." (*Id.*) Shrader also disagreed with Morgan's finding that there was no plan in place when Oberhauser returned to the MJHS. (*Id.*) Shrader concluded as follows:

> In conclusion, the proposed plan places me and Oberhauser in a comparable position. It does not recognize the nature and extent of his behavior and does not recommend any consequences if his conduct persists. The recommendations and proposed plan do not clearly address the actual problem: Oberhauser's persistent acts of retaliation on account of my original, and continued complaints about his retaliatory conduct toward me. As I mentioned, when the District failed and refused to act, I saw no option but to seek protection from the police department. The police department told Oberhauser the same thing he had been told by administrators - stay away from Mrs. Shrader. From his actions, it appears he is incapable of such conduct. Absent some further action by the District to inform him that further actions will result in disciplinary actions, I do not see that he is incapable [sic] of adhering to a plan which simply sets forth what he has been told - stay away from Mrs. Shrader.

(*Id*. at PageID# 1536.)

Blair testified that she felt personally attacked by Shrader's email and "had a little bit of a breakdown." (Blair Depo. at Tr. 72-73.) Blair felt that "no matter all of the work that [she] had done trying to help the situation," she "was never going to make everybody happy." (*Id*. at Tr. 73.) Blair testified that she "cried for about three hours" because she felt that Shrader's email leveled "accusations of me doing things to intentionally not help her," which Blair testified "couldn't be farther from the truth." (*Id*. at Tr. 73-74.)

### F. The Board adopts Morgan's findings and implements Responsive Actions

On May 24, 2024, Assistant Superintendent Fortner notified Shrader and Oberhauser that the District had decided to implement the following Responsive Actions (hereinafter "District Responsive Actions"):

> In response to the recommendations made by the Decision Maker on May 10, 2024 the following will be in place:
>
> • Contact Restrictions, as described below will remain in effect until further notice.
>
> > Guy Oberhauser and Monica Shrader are being instructed to not make intentional contact with one another. Mr. Oberhauser will not attend any Massillon Intermediate specific school events and Mrs. Shrader will not attend any Massillon Junior High events.
> >
> > Mr. Oberhauser will stay out of the Massillon Intermediate School areas unless there is an emergency. This excludes the Massillon Intermediate School administrative offices.
> >
> > Mrs. Shrader will stay out of the Massillon Junior High School areas unless there is an emergency. This excludes the Massillon Junior High School administrative offices and Mrs. Talkington's classroom (room 800).
> >
> > Both parties, if they see one another, will immediately tum around and find an alternative route. (This excludes emergency situations).
>
> • To help limit time in the mailroom, Mr. Oberhauser will check for mail before the start of the student school day (7:15-7:45) and also at the end of the school day (2:30-2:45). If there is a need for something from the mailroom outside of these timeframes, call the office for assistance.
>
> • The MOU that was signed on September 30, 2022 will remain in effect. ***
>
> • Mrs. Shrader and Mr. Oberhauser will communicate concerns with their building principals as they arise.
>
> The District will continue to implement these recommendations while both are employees or until further notice. These recommendations may be reviewed at any time at the request of either party.

(Blair Depo. at Tr. 70-71; Doc. No. 42-33; Fortner Depo. at Tr. 18-19; Doc. No. 42-29.)

Shrader subsequently sent two emails to Blair requesting a meeting to discuss the District Responsive Actions. (Doc. No. 42-57; Blair Depo. at Tr. 72.) When Blair failed to respond, Talkington sent an email to Blair on June 11, 2024, explaining that Shrader was filing a grievance against Blair "due to the district reprimanding her by placing her on a plan when she filed a Title VII complaint against Mr. Oberhauser." (*Id.*) *See also* Blair Depo. at Tr. 77-78; Doc. No. 42-63. Talkington asserted that "the plan that the district placed Mrs. Shrader on is more restrictive than the plan the district designed for Mr. Oberhauser." (*Id.*) *See also* Doc. No. 42-63. Shrader's grievance was denied. (Blair Depo. at Tr. 77-78; Doc. Nos. 42-61.)

## II. Procedural History

On July 29, 2024, Shrader filed a Complaint in this Court against the Board and Oberhauser, asserting the following claims: (1) Title VII Retaliation against the Board (Count I); and (2) Intentional Infliction of Emotional Distress against Oberhauser (Count II). (Doc. No. 1.) The Board filed its Answer on September 27, 2024, and Oberhauser filed his Answer on November 12, 2024.[31] (Doc. Nos. 7, 8.)

---

[31] In her Brief in Opposition, Shrader asserts that Oberhauser violated the District Responsive Actions in February 2025. Specifically, Shrader notes that, on February 11, 2025, Talkington sent an email to Principal Smith advising that, on that date, she noticed that Oberhauser was present in a classroom located next to hers that was used by Kelsey Spino. (Talkington Depo. at Tr. 36-38, 78-79; Doc. No. 42-35.) Talkington explained that there are four classrooms that are physically located on the MJHS side of the Middle School Complex but are used by MIS teachers. (Talkington Depo. at Tr. 36-37.) These include Talkington's and Spino's classrooms. (*Id.*; Doc. No. 42-35.) Talkington was concerned about the fact that Oberhauser was in Spino's classroom because, in her view, Spino's classroom was in an MIS area and, therefore, Oberhauser was not supposed to be there under the District Responsive Actions. (Talkington Depo. at Tr. 36-37.) Talkington was also concerned because, under the District Responsive Actions, Shrader was permitted to come to Talkington's room and used Talkington's room as a "safe space." (*Id.* at Tr. 38-39, 79.) Both Talkington and Shrader acknowledged, however, that Shrader was not, in fact, present in or near Talkington's room when Talkington saw Oberhauser in Spino's room. (*Id.* at Tr. 79; Shrader Depo. at Tr. 133.) On February 24, 2025, Talkington had a meeting with Assistant Superintendent Fortner. (Talkington Depo. at Tr. 80-81; Doc. No. 42-48.) Later that day, Talkington sent an email to Fortner expressing concern that the District had failed to address Oberhauser's alleged violation of the District Responsive Actions. (*Id.*) On March 11, 2025, Fortner sent an email to Talkington, in which he represented that the District had "look[ed] into this issue" and "confirmed that Mr. Oberhauser was in Ms. Spino's room." (Fortner Depo. at Tr. 22; Doc. No. 42-32.) Fortner also noted that "we also confirmed that there was no interaction or even visual contact

On December 18, 2024, the Court conducted a Case Management Conference ("CMC"), in which it set the following deadlines: (1) pleadings to be amended and new parties joined by January 9, 2025; (2) non-expert and expert discovery to be completed by September 12, 2025; and (3) dispositive motions to be filed on October 7, 2025. (Doc. No. 14.)

Meanwhile, on December 5, 2024, Oberhauser filed a Motion for Judgment on the Pleadings with respect to Shrader's Intentional Infliction of Emotional Distress claim in Count II. (Doc. No. 12.) Shrader filed a Brief in Opposition on January 6, 2025, and then her First Amended Complaint on January 9, 2025. (Doc. Nos. 15, 16.) In the First Amended Complaint, Shrader asserted the same claims against the Board and Oberhauser but included additional factual allegations in support of those claims. (Doc. No. 16.) On January 10, 2025, the Court denied Oberhauser's Motion for Judgment on the Pleadings (Doc. No. 12) as moot in light of the filing of the First Amended Complaint.

Shortly thereafter, on January 21, 2025, Oberhauser filed a Motion to Dismiss Plaintiff's Intentional Infliction of Emotional Distress claim pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. No. 17.) Shrader filed a Brief in Opposition on February 20, 2025, to which Oberhauser replied on March 6, 2025. (Doc. Nos. 19, 20.) On May 27, 2025, the Court issued a Memorandum Opinion & Order

---

between Mr. Oberhauser and Ms. Shrader, which is the issue we are attempting to avoid." (Doc. No. 42-32 at PageID# 1576.) Fortner then "clarified" the District Responsive Actions as follows. Fortner directed that (1) "[b]oth employees have access to the Media Center located between the Massillon Intermediate Pod (Grades 5-6) and Andrea Talkington's Room;" (2) "[b]oth employees are permitted access to the MIS/MJHS stairwell and any of the rooms left or North of the stairwell; and (3) "[i]f one employee sees the other, the employee will immediately turn around and find an alternative route." (Doc. No. 42-32.) Talkington testified that the District did not discuss the above "clarifications" with her or Shrader before imposing them. (Talkington Depo. at Tr. 82.) Shrader was upset because she felt that Oberhauser had violated the District Responsive Actions and that the District had responded by effectively taking away her "safe space." (Shrader Depo. at Tr. 132-133.) According to Talkington, Shrader will no longer come to her (i.e., Talkington's) room. (Talkington Depo. at Tr. 83, 89.)

granting Oberhauser's Motion to Dismiss Count II of the First Amended Complaint and dismissing him from the case. (Doc. No. 21.)

After receiving two extensions of the discovery and dispositive motion deadlines, the Board filed a Motion for Summary Judgment as to Shrader's remaining Title VII Retaliation claim on January 16, 2026. (Doc. No. 40.) Shrader filed her Brief in Opposition on February 27, 2026, to which the Board replied on March 9, 2026. (Doc. Nos. 44, 45.)

## III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487. At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*,

295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508–09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

There is an "added wrinkle" where, as here, there is video evidence. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). As the Sixth Circuit has explained, "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Harris*, 550 U.S. at 380). However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id.* *See also Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015).

**IV. Analysis**

In her sole remaining count (i.e., Count I of the First Amended Complaint), Shrader alleges a claim captioned "Title VII Retaliation against the Massillon City Schools." (Doc. No. 16 at PageID#s 104-107.) Therein, Shrader alleges that Defendant "knew that [] Oberhauser would continue to

retaliate against and harass [her] on account of her prior sex-based and retaliation claims against him after he bid back into a seventh-grade teaching position" but nonetheless "did not take any remedial action." (*Id.*) Shrader alleges that "[d]ue to their failure and refusal to take any prompt remedial action to prevent [] Oberhauser's conduct, the Massillon City Schools have fostered and condoned the harassing and retaliatory conduct of [] Oberhauser and the Massillon City Schools have also retaliated against Mrs. Shrader on account of her repeated protected activity in the form of complaints of harassment and retaliation as well as her prior protected activity ...., all of which have and continue to subject Mrs. Shader to a hostile work environment which has been fostered and condoned by the acts and omissions of the Massillon City Schools." (*Id.* at PageID# 105.) In sum, Shrader alleges that Defendant "placed [her] in harm's way in retaliation for her continued protected activity and fostered and condoned a hostile work environment," causing her to "not feel safe in the workplace" and "suffer[] from extreme daily fear and anxiety as she never knows when Mr. Oberhauser will intentionally and maliciously seek her out." (*Id.* at PageID#s 105-106.)

Defendant interprets Count I as asserting retaliation claims based on (1) alleged actions taken by the Board itself (through its administrators) in retaliation for Shrader's protected activity (i.e., a direct retaliation claim); and (2) the Board's alleged failure to prevent Oberhauser from harassing her in retaliation for her protected activity (i.e., a coworker retaliation claim).[32] (Doc. No. 40 at PageID#

[32] As discussed in more detail *infra*, in its Motion, Defendant argues that it is entitled to judgment in its favor with respect to Shrader's *retaliation* claims (*see* Doc. No. 40 at PageID#s1459-1460) but then appears to conflate a coworker *retaliation* claim with a coworker *hostile work environment* claim. The Sixth Circuit, however, treats these as separate and distinct claims with different elements. *See, e.g., Hawkins v. Anheuser-Busch*, 517 F.3d 321 at 332 (setting forth elements of coworker hostile work environment claim) and 345 -347 (recognizing and setting forth elements of coworker retaliation claim) (6th Cir. 2008). In her Brief in Opposition, Shrader expressly characterizes and treats this claim as one for coworker *retaliation* and argues that she has come forward with sufficient evidence to create a genuine issue of material fact that Defendant is liable for coworker *retaliation* under Title VII. (Doc. No. 44 at PageID# 1795-1803.) Thus, the Court will treat (and refer to) this claim as a "coworker retaliation claim."

1459.) Defendant seeks summary judgment in its favor with respect to both Shrader's direct retaliation and coworker retaliation claims.

Defendant first argues that Shrader cannot establish a *prima facie* case of direct retaliation because she cannot demonstrate that the Board itself took any adverse action against her. (*Id*. at PageID# 1461-1462.) Specifically, Defendant maintains that the Interim Supportive Measures do not constitute an "adverse employment action" because there is no evidence that these Measures had any impact on Shrader's job responsibilities and/or her ability to do her job. (*Id*.) Defendant further asserts that, even if the Interim Supportive Measures could be considered an adverse employment action, Shrader "has not established how being placed on the Interim Supportive Measures was connected to any protected activity she took." (*Id*. at PageID# 1463.) Finally, even if Shrader had established a *prima facie* case of direct retaliation, Defendant argues that it had a legitimate, non-discriminatory business reason for putting supportive measures in place. (*Id*. at PageID# 1464.)

Defendant next argues that it is entitled to summary judgment in its favor with respect to Shrader's coworker retaliation claim because "Shrader cannot establish that she was subjected to a hostile work environment by Oberhauser and even if she could, she cannot establish employer liability." (*Id*. at PageID#s 1465-1473.) Defendant maintains that "no reasonable person" could find the conduct reported by Shrader against Oberhauser (i.e., the October 2023 Pep Rally Incident, the November 2023 Walkabout, or the January 2024 Ice Cream Social Incident) to be so severe or pervasive that it created an abusive environment. (*Id*. at PageID#s 1466-1472.) Defendant further asserts that Shrader cannot establish a causal connection because she "cannot tie the conduct she perceives as acts and omissions by the Board to any protected activity in which she engaged." (*Id*. at PageID# 1472.) Lastly, Defendant argues that, even if Shrader could establish a *prima facie* case of

coworker retaliation, it is nonetheless entitled to judgment in its favor because it had legitimate, non-discriminatory business reasons for its responses to Shrader's reports of issues with Oberhauser. (*Id*. at PageID# 1473.)

In response, Shrader does not acknowledge or address Defendant's argument that it is entitled to judgment in its favor with respect to Shrader's direct retaliation claim. (Doc. No. 44.) Rather, Shrader argues that she has come forward with sufficient evidence to create a genuine issue of material fact regarding her claim against the Board for failing to sufficiently address Oberhauser's severe and pervasive retaliatory conduct. (Doc. No. 44 at PageID# 1798.) Relying on the test for Title coworker retaliation claims set forth in *Hawkins v. Anheuser-Busch,* 517 F.3d 321, 347 (6th Cir. 2008), Shrader maintains that "the evidence clearly demonstrates a course of severe and pervasive retaliatory conduct by Oberhauser and the indifference and unreasonableness in the District's failure to take any prompt and effective action, which fostered, condoned, and tolerated Oberhauser's actions until the situation became so out of control that the District had to step up and unilaterally adopt measures to stop Oberhauser's conduct, which it could have done much earlier in order to protect Shrader from harm." (*Id*. at PageID#s 1801-1802.) Shrader further asserts that there is a causal connection between the acts and omissions of the Board and her protected activity. (*Id*. at PageID# 1803.) Lastly, Shrader argues that the Board had no legitimate, non-discriminatory reason for its "failure to take prompt remedial action or even respond to Shrader's complaints of retaliation." (*Id*. at PageID# 1804.)

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A Title VII retaliation claim can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Medical Products, Inc*., 515 F.3d 531, 538 (6th Cir. 2008). *See also Laster v. City of Kalamazoo,* 746 F.3d 714, 730 (6th Cir. 2014). Here, Shrader relies solely on circumstantial evidence. (Doc. No. 44 at PageID# 1796.) Therefore, Shrader's retaliation claim is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). *See Laster*, 746 F.3d at 730.

Under *McDonnell Douglas*, a plaintiff bears the initial burden to establish a *prima facie* case of retaliation. *See Laster*, 746 F.3d at 730. If the plaintiff succeeds in making out the elements of a *prima facie* case, the burden of production of evidence shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions. *Id*. If the defendant/employer satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that the defendant/employer's proffered reason was not the true reason for the employment decision. *Id. See also Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir.2007). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Dixon*, 481 F.3d at 333. *See also Laster,* 746 F.3d at 730.

Ordinarily, to establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate that: "'(1)[s]he engaged in activity protected by Title VII; (2) h[er] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was

'materially adverse' to the plaintiff;[33] and (4) a causal connection existed between the protected activity and the materially adverse action.'" *Laster*, 746 F.3d at 730 (quoting *Jones v. Johanns*, 264 Fed. Appx. 463, 466 (6th Cir. 2007)). Title VII retaliation claims "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013).

As noted *supra*, in Count I, Shrader arguably raises a claim for direct retaliation against the Board; i.e., a claim that the Board itself (through its administrators) took a materially adverse action against her in retaliation for her protected conduct. Defendant moves for summary judgment on this claim, arguing that Shrader has failed to come forward with sufficient evidence from which a reasonable jury could find either that Defendant took a materially adverse employment action against her, or that a causal connection exists between her protected activity and any such adverse action by Defendant. (Doc. No. 40.) Defendant also argues that, even if Shrader had established a *prima facie* case of direct retaliation, Defendant had a legitimate, non-discriminatory business reason for its action. (*Id.*)

Shrader fails to acknowledge or address Defendant's arguments at any point in her Brief in Opposition. (Doc. No. 44.) Considering Shrader's lack of opposition, the Court finds that Shrader

---

[33] The plaintiff's burden of establishing a materially adverse employment action is "less onerous in the retaliation context than in the anti-discrimination context." *Michael v. Caterpillar Financial Services Corp*., 496 F.3d 584, 595–96 (6th Cir. 2007)(citing *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–71 (2006)). Unlike a Title VII discrimination claim, "the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington Northern*, 548 U.S. at 57. Rather, to establish the third element of a *prima facie* Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68 (internal quotation marks and citations omitted). *See also Laster*, 746 F.3d at 731.

has abandoned her direct retaliation claim against Defendant. *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021) (plaintiff abandoned claims not discussed in opposition to motion for summary judgment or on appeal); *Brown v. VHS of Mich., Inc.,* 545 Fed. Appx 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") *See also Lisan v. Wilkie*, 835 Fed. Appx 831, 834–35 (6th Cir. 2020); *Nowlin v. Nova Nordisk Inc.,* 2018 WL 1805141 at *3 (6th Cir. Feb. 28, 2018); *Haddad v. Sec'y, U.S. Dep't of Homeland Sec.*, 610 Fed. Appx 567, 568 (6th Cir. 2015); *Hicks v. Concorde Career Coll.*, 449 Fed. Appx 484, 487 (6th Cir. 2011). Accordingly, the Court finds that, to the extent Shrader asserts a claim for direct retaliation under Title VII in Count I of the First Amended Complaint, Defendant is entitled to judgment in its favor with respect to this claim.

The Court next considers Defendant's argument that it is entitled to summary judgment in its favor with respect to Shrader's claim for coworker retaliation. In *Hawkins v. Anheuser-Busch*, 517 F.3d 321 (6th Cir. 2008), the Sixth Circuit recognized "that Title VII protects against coworker retaliatory harassment that is known to but not restrained by the employer," and set forth a test for determining when coworker conduct constitutes retaliation actionable under Title VII. *Id*. at 345, 347. *See also Jones v. Fluor Facility & Plant Services,* 2025 WL 707869 at * 12 (6th Cir. March 5, 2025). "When a plaintiff alleges coworker retaliation, instead of assessing whether his employer took an adverse employment action against him, we assess whether an employer is liable for a coworkers' retaliatory actions." *Jones,* 2025 WL 707869 at * 12. Specifically, in *Hawkins*, the Sixth Circuit held that employer liability will attach for a coworker's actions if:

> (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2)

> supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

*Hawkins*, 517 F.3d at 347 (hereinafter "the *Hawkins* test"). *See also Wierango v. Akal Security, Inc.*, 580 Fed. Appx. 364, 372 (6th Cir. 2014); *Szeinbach v. Ohio State University*, 493 Fed. Appx. 690, 695 (6th Cir. 2012); *Perkins v. Harvey*, 368 Fed. Appx 640, 647–48 (6th Cir. 2010); *Jones,* 2025 WL 707869 at * 12; *Garcia v. Beaumont Health Royal Oak Hospital,* 2022 WL 5434558 at * 7 (6th Cir. Oct. 7, 2022); *Alexander v. University of Memphis*, 2021 WL 2579973 at * 5 (6th Cir. June 7, 2021). As with the traditional Title VII retaliation inquiry, the coworker's retaliatory conduct needs to be causally linked to activity protected under Title VII. *See Perkins*, 368 Fed. Appx at 647–48. And "liability must be limited to 'appropriate circumstances' to ensure [that] 'employers are held liable for only their own indifferent or unreasonable behavior.'"[34] *Garcia,* 2022 WL 5434558 at * 7 (quoting *Hawkins,* 517 F.3d at 346-347)).

Here, Defendant does not dispute that the second element of the *Hawkins* test is met, i.e., that supervisors or members of management had actual or constructive knowledge of Oberhauser's allegedly retaliatory behavior. Defendant does, however, dispute the first and third elements, arguing

[34] In *Garcia*, a panel of the Sixth Circuit noted that "[a] review of our case law confirms that this claim is not easily established." *Garcia*, 2022 WL 5434558 at * 8. The court explained: "To date [i.e., as of October 2022], we could only identify two cases in which this court reversed summary judgment for a coworker's retaliatory conduct—both involving egregious circumstances. In *Hawkins* itself, the coworker (the target of numerous sexual harassment complaints) set fire to one woman's car and another's house after they had lodged complaints with management. *Id*. at 347-49. In *Szeinbach v. Ohio State University*, 493 F. App'x 690 (6th Cir. 2012) (Table), the coworker, a member of the College of Pharmacy faculty, maliciously reported the plaintiff to the university for alleged research misconduct regarding two of her academic publications. *Id*. at 694. He then spread these false reports to multiple faculty members at other universities, including a prospective employer who, after receiving his email, ceased all discussions of future employment with the plaintiff. *Id.* at 695." *Id*. at * 8.

that Shrader has failed to come forward with sufficient evidence to create a genuine issue of material fact with respect to either of them. The Court will address the first and third element of the *Hawkins* test separately, below.

**A. First Element: Sufficiently Severe Retaliatory Conduct**

The first issue is whether Shrader has come forward with sufficient evidence from which a reasonable jury could conclude that Oberhauser's "retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination." *Hawkins*, 517 F.3d at 347. Defendant argues that "no reasonable person would find the conduct reported by Shrader against Oberhauser ... to be so severe or pervasive that it created an abusive environment." (Doc. No. 40 at PageID#s 1465-1472.) Defendant emphasizes that, at no point since Oberhauser returned to the Middle School Complex, have Shrader and Oberhauser spoken to one another or come into physical contact with one another. (*Id.*)

Regarding the October 2023 Pep Rally Incident, Defendant asserts that "no reasonable person" would find Oberhauser's presence in the same gymnasium with Shrader (along with hundreds of other people) to be severe, even assuming that Oberhauser glared at Shrader and stood near her. (*Id.*) Regarding the November 2023 Walkabout, Defendant maintains that this incident cannot reasonably be considered as severe conduct given that Shrader did not see Oberhauser or have any contact with him when he walked his students past her classroom. (*Id.*) And regarding the January 2024 Ice Cream Social Incident, Defendant argues that Oberhauser's mere presence in the crowded cafeteria at the same time as Shrader cannot be considered as severe conduct given that Oberhauser and Shrader did not speak to each other and were on opposite sides of the cafeteria during the brief moments that Oberhauser attended the ice cream social. (*Id.*) Lastly, Defendant argues that, even

considering each of the incidents together as a whole, "three brief 'incidents' of seeing a coworker in a shared working space over a four-month period of time amounts to sporadic conduct at most." (*Id.* at PageID# 1471.)

In response, Shrader argues that "Oberhauser's conduct was not sporadic, rather for a period of three months, between October 23, 2023 and January 18, 2024 he engaged in a severe and pervasive course of action to harass and retaliate against Shrader; her workplace was permeated by Oberhauser's conduct; and his actions caused her severe anxiety attacks which unreasonable interfered with her work performance." (Doc. No. 44 at PageID# 1802.) Shrader asserts that Oberhauser's conduct "involved an element of physical invasion of Shrader's space, intended to harass retaliate and cause her harm, and was comparable to the conduct that led the District to take action to discipline and remove him from Shrader's workplace" during the 2020-2021 school year. (*Id.*)

In its Reply Brief, Defendant argues that "courts do not transform ordinary workplace proximity into actionable harassment simply because an employee finds a coworker's mere presence subjectively upsetting." (Doc. No. 45 at PageID# 1808.) Defendant maintains that the conduct at issue in *Shrader I* did "not involve threats, violence, or anything approaching the type of serious misconduct that could transform brief, non-contact sightings in crowded, common areas years later into 'severe and pervasive' harassing conduct." (*Id.* at PageID# 1809.) Defendant again emphasizes that "the record shows no physical contact, no verbal contact, and no policy-violating interaction between Shrader and Oberhauser at the pep rally, during the walking incident, at the ice cream social, or on any other occasion." (*Id.* at PageID# 1810.) Defendant then asserts that the three incidents that occurred during the 2023-2024 school year are insufficient as a matter of law to constitute severe and

pervasive harassment because "[t]he frequency is minimal (three brief episodes over months); the severity is lacking (no physical invasion, no threats, no humiliating acts); and there is no objective interference with work shown by any interaction—because there was none." (*Id*. at PageID# 1817.)

As an initial matter, the Court notes that the parties' briefing on this issue is confusing and internally inconsistent. Throughout its Motion, Defendant characterizes this claim as a retaliation claim and purports to analyze it in the context of a Title VII coworker retaliation claim. (Doc. No. 40 at PageID#s 1435, 1459-1460, 1465.) However, in support of its argument, Defendant cites and relies principally on Sixth Circuit cases involving Title VII coworker hostile environment claims. (*Id*. at PageID# 1465) (citing *Waldo v. Consumers Energy Co*., 726 F.3d 802, 814 (6th Cir. 2013) and *Johnson v. Donahoe*, 642 Fed. Appx. 599, 611 (6th Cir. 2016)). But the Sixth Circuit has made clear that coworker hostile work environment claims and coworker retaliation claims are separate and distinct claims with different elements. *See, e.g., Hawkins*, 517 F.3d at 332-344 (evaluating coworker hostile work environment claim) and 344-349 (evaluating coworker retaliation claim). [35] In her Brief

[35] Specifically, in *Hawkins,* the Sixth Circuit first analyzed the plaintiffs' Title VII coworker hostile work environment claims, explaining that "[t]o establish a *prima facie* case based upon coworker harassment, a plaintiff must establish that (1) the sexual harassment was unwelcome, (2) the harassment was based on sex, (3) the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Hawkins*, 517 F.3d at 332. In evaluating the third element (i.e., whether the harassing behavior was sufficiently severe or pervasive), the Sixth Circuit applied the Supreme Court's discussion of that element in *Harris v. Forklift Sys., Inc*., 510 U.S. 17 (1993), a hostile work environment case. The Sixth Circuit further noted that "a company may be held liable for coworker harassment if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Id*. at 338 (internal citation and quotation omitted). Later in the decision, the Sixth Circuit separately discussed and analyzed the plaintiffs' Title VII coworker *retaliation* claims. *Id*. at 344-349. In the context of that discussion, the Sixth Circuit formally recognized that "in appropriate circumstances, Title VII permits claims against an employer for coworker retaliation." *Id*. at 346. The Sixth Circuit then set forth a different test for evaluating such claims, as set forth *supra* and as follows: "an employer will be liable for the coworker's actions if (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances." *Id*. at

in Opposition, Shrader does not acknowledge this distinction and simply responds by citing and applying the test set forth in *Hawkins* for coworker retaliation claims. (Doc. No. 44 at PageID# 1798-1799.) At no point does Shrader argue that she is asserting a coworker hostile work environment claim in Count One nor does she set forth and/or apply the elements of such a claim at any point in her Brief.

The Court finds as follows. After careful consideration, the Court interprets the parties' summary judgment briefing as relating to Shrader's Title VII coworker *retaliation* claim. As such, the Court will therefore evaluate Shrader's Title VII coworker retaliation claim under the *Hawkins* test set forth *supra* and will apply Sixth Circuit case law applying that particular test to the facts of the instant case, viewed in a light most favorable to Shrader. Thus, to be very clear, in evaluating the first element of the *Hawkins* test, the Court will apply Sixth Circuit cases regarding the meaning of the phrase "sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination," as that phrase is interpreted and applied by the Sixth Circuit in the context of Title VII coworker retaliation claims (i.e., rather than applying the case law cited by Defendant, which interprets the phrase "sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment" in the context of Title VII coworker hostile work environment claims).

A review of Sixth Circuit Title VII coworker retaliation cases reveals that, in evaluating the first element of the *Hawkins* test, the Sixth Circuit routinely cites and relies on the standard set forth in *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). *See, e.g., Jones*, 2025

---

347. *See also Garcia*, 2022 WL 5434558 at fn 1 (noting that "[r]etaliation and sexual harassment create distinct legal claims").

WL 707869 at * 13; *Wierengo*, 580 Fed. Appx. at 373; *Szeinbach*, 493 Fed. Appx. at 693-696; *Alexander*, 2021 WL 2579973 at * 6; *Rodriguez-Monguio v. Ohio State University*, 499 Fed. Appx. 455, 466-467 (6th Cir. 2012). In *Burlington,* the Supreme Court explained as follows:

> The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. *** In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Rochon*, 438 F.3d, at 1219 (quoting Washington, 420 F.3d, at 662).
>
> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services*, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *see Faragher*, 524 U.S., at 788, 118 S.Ct. 2275 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'"). An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. *See* 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable under § 704(a)). The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson*, 519 U.S., at 346, 117 S.Ct. 843. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. *See* 2 EEOC 1998 Manual § 8, p. 8–13.
>
> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here. *See, e.g., Suders*, 542 U.S., at 141, 124 S.Ct. 2342 (constructive discharge doctrine); *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (hostile work environment doctrine).
>
> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The

> real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale, supra*, at 81–82, 118 S.Ct. 998. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. *** A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. *** Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others." *Washington, supra*, at 661.

*Burlington Northern*, 548 U.S. at 67-69.

Relying on *Burlington*, the Sixth Circuit has found (in a series of unreported cases) harassing conduct by coworkers such as shunning, ostracizing, making disparaging remarks, and engaging in workplace gossip to be the sort of "petty slights" and "minor annoyances" that do not satisfy the first element of the *Hawkins* test, i.e., conduct that is not "sufficiently severe" to dissuade a reasonable worker from engaging in protected activity. *See, e.g., Wierengo*, 580 Fed. Appx. at 373 (finding that coworkers' acts of shunning, ostracizing, and making complaints against plaintiff did not rise to the level of an adverse employment action); *Rodriguez-Monguio*, 499 Fed. Appx. at 467 (finding that disparaging remarks by coworkers did not constitute materially adverse employment action); *Garcia*, 2022 WL 5434558 at * 8 (finding that coworkers' "workplace gossip" about plaintiff was not sufficiently severe to dissuade a reasonable person from lodging a complaint).

On the other end of the spectrum, the Sixth Circuit has found that plaintiffs have come forward with sufficient evidence to create a genuine issue of material fact regarding the first element of the *Hawkins* test where they have been threatened with or the victim of physical violence, or have been subjected to conduct that could otherwise have put their physical safety in jeopardy. *See, e.g., Hawkins*, 517 F.3d at 347-348 (reversing grant of summary judgment to employer on coworker

retaliation claim where plaintiff claimed that coworker set her car on fire and threatened to kill her in retaliation for her reporting his sexual harassment of her to supervisors); *Jones,* 2025 WL 707869 at * 13 (reversing grant of summary judgment to employer where coworker threw grease on plaintiff's car, which constituted an "unprovoked, physical attack that could have put Jones' safety in great jeopardy, had Jones driven his car with the grease obscuring his vision"). *See also King v. Mansfield Correctional Inst*., 2019 WL 498351 at * 10 (N.D. Ohio Feb. 8, 2019) (Nugent, J.) (denying summary judgment to employer on coworker retaliation claim where coworkers taunted, cursed at, spit upon, and engaged in other "potentially humiliating and dangerous acts of alleged retribution" against plaintiff, including allegedly failing to timely respond to plaintiff's "man down" alert in correctional facility); *Ryan v. Shulkin*, 2017 WL 6270209 at * 11 (N.D. Ohio Dec. 8, 2017) (Polster, J.) (concluding that "a reasonable jury could find that coworkers' threats of physical violence would dissuade a reasonable employee from making discrimination claims"). In addition, in *Szeinbach, supra*, the Sixth Circuit found that plaintiff had come forward with sufficient evidence to create a genuine issue of material fact regarding the first element of her coworker retaliation claim where a coworker had "emailed faculty all over the country stating that [plaintiff] had committed research misconduct," which spawned a nearly two year internal investigation and had a "significant negative impact on her professional advancement." *Szeinbach*, 493 Fed. Appx. at 695.

Here, viewing the evidence in a light most favorable to Shrader, the Court finds that she has failed to come forward with evidence from which a reasonable jury could conclude that Oberhauser's conduct was sufficiently severe to dissuade a reasonable worker from making or supporting a charge of discrimination. Shrader predicates her coworker retaliation claim on the three incidents that occurred during the 2023-2024 school year — the October 2023 Pep Rally Incident, the November

2023 Walkabout, and the January 2024 Ice Cream Social Incident. For the following reasons, the Court finds that, even when viewed collectively and in a light most favorable to Shrader, Oberhauser's conduct is not sufficiently severe to satisfy the first element of the *Hawkins* coworker retaliation test because it is more in the nature of "petty slights" and "minor annoyances" which simply do not rise to the level of actionable coworker retaliatory conduct.

At the outset, the Court notes that it is undisputed that Oberhauser did not speak to or have any physical contact with Shrader during either the October 2023 Pep Rally Incident, the November 2023 Walkabout, or the January 2024 Ice Cream Social Incident. (Shrader Depo. at Tr. 41, 67, 69-70, 78-79; Talkington Depo. at Tr. 102-103.) Moreover, Shrader has not come forward with any evidence that Oberhauser threatened her verbally or in writing at any point during the 2023-2024 school year. Rather, Shrader argues that Oberhauser's conduct was "sufficiently severe" to satisfy the first element of the *Hawkins* test because Oberhauser (1) glared at her and stood in close proximity to her during the October 2023 Pep Rally; (2) intentionally provoked her by "parading" his students past her classroom in November 2023; and (3) was in the same room and made eye contact with her during the January 2024 Ice Cream Social. (Doc. No. 44.) *See also* Shrader Depo. at Tr. 40-44, 67, 78-79.

Even viewing this evidence in a light most favorable to Shrader, the Court finds that it is insufficient to create a genuine issue of material fact that Oberhauser's conduct was sufficiently severe. As Defendant correctly notes, at the time of the October 2023 Pep Rally Incident, the gymnasium was filled with students, teachers, administrators, and staff.[36] At no point in time during

---

[36] Shrader testified that there were over seventy (70) people in the gymnasium during the October 2023 Pep Rally. (Shrader Depo. at Tr. 46-47.) This is generally consistent with the video footage of the pep rally.

the pep rally was Shrader alone with Oberhauser, including when he allegedly gave her a "death stare" and stood in her vicinity. Nor is there any evidence that Oberhauser spoke to Shrader or in any way blocked her entry or exit from the gymnasium. Although the Court understands that Shrader was anxious being in Oberhauser's presence due to the events of the 2020-2021 school year, the Court finds that, under the circumstances presented, a reasonable jury could not conclude that Oberhauser's acts of being near Shrader and glaring at her in a crowded gymnasium, were sufficiently severe to constitute a materially adverse employment action under Sixth Circuit case law.

The Court reaches a similar conclusion regarding Oberhauser's conduct during the November 2023 Walkabout. It is undisputed that Oberhauser did not speak with Shrader and had no contact with her whatsoever during this incident. It is also undisputed that he did not enter Shrader's classroom, hover near her doorway, speak her name, or interact with her in any way. Moreover, the video footage shows that Oberhauser was in the hallway outside of Shrader's classroom for no more than one (1) minute. Even assuming that Oberhauser was being a "jerk" when he walked past Shrader's classroom and intentionally tried to make her uncomfortable, the Court finds that, under these circumstances, his conduct during the November 2023 Walkabout was not sufficiently severe to constitute a materially adverse action.

Lastly, the Court finds that Shrader has failed to come forward with evidence from which a reasonable jury could conclude that Oberhauser's conduct during the January 2024 Ice Cream Social Incident was sufficiently severe under the first element of the *Hawkins* test. Again, it is undisputed that Oberhauser did not speak with Shrader, approach her, or come into physical contact with her at any point during this incident. On the contrary, a careful review of the video footage shows that Oberhauser stayed on the opposite side of the cafeteria from Shrader, went nowhere near her, and left

the cafeteria after approximately two to three minutes. While Oberhauser's mere presence in the cafeteria upset Shrader, the Court finds that his conduct during this incident is not sufficiently severe to dissuade a reasonable person from engaging in protected activity.

The Court further finds that viewing these three incidents collectively does not tip the balance in favor of finding a genuine issue of material fact. While Shrader asserts that these three incidents together constitute a "severe and pervasive course of action to harass and retaliate against her," the Court disagrees. While Oberhauser's behavior may have been thoughtless and/or unkind, it simply does not rise to the level of severity that would dissuade a reasonable worker from making or supporting a charge of discrimination under Title VII. As the Supreme Court noted in *Burlington*, "an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern*, 548 U.S. at 68. Although Shrader undoubtedly experienced a high level of anxiety when she unexpectedly found herself in Oberhauser's presence, the Court finds that there is no genuine issue of material fact that a reasonable worker would not be deterred from engaging in protected activity by Oberhauser's conduct here, even when his conduct during the 2023-2024 school year is viewed as a whole and in the context of the events of the 2020-2021 school year.[37]

Notably, Shrader cites no authority that Oberhauser's conduct during the 2023-2024 school year (either viewed singly or collectively) is sufficiently severe to satisfy the first element of the

[37] The Court also disagrees with Shrader's argument that Oberhauser's conduct during the 2023-2024 school year "was comparable to the conduct that led the District to take action and remove him from Shrader's workplace" during the 2020-2021 school year. (Doc. No. 44 at PageID# 1802.) During the 2020-2021 school year, Oberhauser allegedly verbally assaulted Shrader in front of a student teacher, which made Shrader feel physically threatened. *See, e.g.,* Doc. No. 42-22 at PageID#s 1554-1555; Talkington Depo. at Tr. 111-112; *Shrader I,* Case No. 5:22cv1559 (Doc. No. 1-4.) Indeed, Oberhauser himself testified that, during the 2020-2021 school year, he "let his anger get the best of him." (Oberhauser Depo. at Tr. 98.) Here, however, it is undisputed that Oberhauser did not speak to Shrader (or threaten her verbally or in writing) at any time during the 2023-2024 school year.

*Hawkins* coworker retaliation test. The only authority cited by Shrader in support of this argument is *Hawkins, supra* itself. (Doc. No. 44 at PageID# 1802.) However, the Court finds that *Hawkins* is easily distinguishable from this case. In that case, the Sixth Circuit found that plaintiff Cherri Hill had alleged facts sufficient to survive summary judgment on her coworker retaliation claim. *Hawkins,* 517 F.3d at 348. There, Hill asserted that her harassing coworker, Bill Robinson, set fire to her car while it was parked at her home and threatened to kill her if he lost his job. *Id.* at 329-330, 348. Clearly, Oberhauser's alleged conduct in the instant case is nowhere near the same level of severity as the conduct at issue in *Hawkins.*

Accordingly, and for all the reasons set forth above, the Court finds that Shrader has failed to come forward with sufficient evidence to create a genuine issue of material fact regarding the first element of her *prima facie* case of coworker retaliation; i.e., that Oberhauser's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination.

**B. Third Element: Management's Response to Plaintiff's Complaints of Retaliation**

Assuming *arguendo* that Shrader had come forward with sufficient evidence to create a genuine issue of material fact regarding the first element of the *Hawkins* coworker retaliation test, the Court finds that she has failed to do so with respect to the third element. As noted *supra*, under the third element of the *Hawkins* test, an employer may only be held liable for coworker retaliation if "supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances." *Hawkins,* 517 F.3d at 347.

Here, Defendant argues that there is no genuine issue of material fact with respect to this element because "the record shows that the Board, through its administrators, took each of Shrader's complaints seriously, reviewed them, and worked to try to make her feel safe in her environment." (Doc. No. 40 at PageID# 1466.) Regarding the October 2023 Pep Rally Incident, Defendant notes that Blair and Smith both attended the event and monitored the situation, "witnessing nothing improper." (*Id*. at PageID# 1468.) After Shrader reported being upset, Defendant asserts that administrators reviewed video footage of the incident, investigated, considered Shrader's complaint at each level of the grievance process, and "engaged in discussions about how to ensure limited contact between Shrader and Oberhauser." (*Id*.) Defendant further notes that, after the November 2023 Walkabout, administrators pulled video footage of the incident, investigated, and ultimately instructed Oberhauser to stop walking his students past Shrader's classroom. (*Id*. at PageID# 1469.) Defendant maintains that it is undisputed that Oberhauser complied and never walked his students past Shrader's classroom again. (*Id*.)

Likewise, Defendant asserts that it investigated the January 2024 Ice Cream Social Incident by pulling the video footage, investigating, and issuing Oberhauser a verbal warning for not being at his assigned duty during the ice cream social. (*Id*. at PageID# 1471.) Lastly, Defendant notes that it (1) referred the matter to an external investigator at Shrader's request; (2) implemented Interim Supportive Measures pending the outcome of that investigation; and (3) instituted the District Responsive Actions even after concluding that Shrader's Title VII Complaints were not substantiated. (*Id*. at PageID#s 1453-1457, 1471.) In light of the above, Defendant maintains that no reasonable jury could conclude that it condoned, tolerated, or encouraged Oberhauser's retaliatory conduct, or

that its response to Shrader's complaints manifested indifference or unreasonableness under the circumstances.

In response, Shrader argues that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the District in failing to take any proactive steps to safeguard Shrader after Oberhauser bid back into the MIS/MJHS complex." (Doc. No. 44 at PageID# 1799.) Shrader asserts that Superintendent Salvino was well aware of the prior history between Shrader and Oberhauser but nonetheless failed to "take any action to keep Oberhauser at bay," such as implementing "a simple plan modeled after the [September 2022] MOU." (*Id*. at PageID# 1800.) Shrader maintains that "Oberhauser appeared to be emboldened by the lack of a plan or any action by the District notifying him to stay away from Shrader," which led to the three incidents of harassing conduct at issue herein. (*Id.*)

Shrader next argues that, after the October 2023 Pep Rally Incident, "the District did nothing." (*Id*.) She asserts that "[o]nly when Shrader went outside of the school for relief and Oberhauser wrongly accused Shrader of retaliatory conduct did [the] District finally unilaterally exercise its rights under the CBA and issue an interim plan to keep Oberhauser from Shrader." (*Id.* at PageID# 1801.) Shrader complains that the District "unilaterally" issued the District Responsive Actions and then unilaterally modified those Actions to take her safe space away from her. (*Id*.) In sum, Shrader argues that the evidence clearly demonstrates "the indifference and unreasonableness in the District's failure to take any prompt and effective action which fostered, condoned and tolerated Oberhauser's actions until the situation became so out of control that the District had to step up and unilaterally adopt measures to stop Oberhauser's conduct, which it could have done much earlier in order to protect Shrader from harm." (*Id.* at PageID# 1801-1802.)

In its Reply Brief, Defendant argues that it "acted promptly, consistently, and in accordance with policy at every stage." (Doc. No. 45 at PageID# 1807.) Defendant asserts that "Shrader's disagreement with the Board's decisions does not create a genuine dispute of material fact" and "cannot transform documented actions into inaction or indifference." (*Id*. at PageID# 1813.)

For the following reasons, the Court finds that Shrader has failed to come forward with sufficient evidence from which a reasonable jury could conclude that Defendant "condoned, tolerated, or encouraged [Oberhauser's] acts of retaliation" or responded to Shrader's complaints "so inadequately that the response manifests indifference or unreasonableness under the circumstances." *Hawkins,* 517 F.3d at 347. Although Defendant did not proactively implement a new plan in August 2023 to prevent Oberhauser and Shrader from crossing paths, the Court finds that Defendant's failure to do so neither encouraged Oberhauser's retaliatory conduct nor manifested indifference or unreasonableness under the particular circumstances presented. Superintendent Salvino testified that he was aware of the history between Oberhauser and Shrader and notified union president Alice Johnston when he learned that Oberhauser had bid back into the MJHS. (Salvino Depo. at Tr. 18-19, 24-25.) Although Salvino had some concern there might be an issue, he noted that it had been two years since Shrader and Oberhauser's conflicts during the 2020-2021 school year. (*Id*. at Tr. 25, 79.) Salvino suggested that this was a significant amount of time and that proactively implementing a plan before Oberhauser had even set foot in the MJHS might "have potentially created additional issues that currently weren't there at the beginning of the school year." (*Id*.)

While in hindsight it might have been more prudent to meet separately with Shrader and Oberhauser at the very beginning of the 2023-2024 school year to explore the possibility of developing a new plan, the Court cannot find that in failing to do so Defendant "condoned, tolerated,

or encouraged the acts of retaliation" or "manifest[ed] indifference or unreasonableness under the circumstances." *Hawkins,* 517 F.3d at 347. As Salvino correctly observed, two years had passed since the events of *Shrader I.* And although Oberhauser was returning to the MJHS, Shrader no longer taught on that side of the building — she was a fifth grade teacher in the MIS. Thus, Oberhauser's and Shrader's classrooms were on opposite sides of the Complex. Moreover, all parties appear to agree that the September 2022 MOU was still in place and, therefore, would address any potential interactions between Shrader and Oberhauser during the August 2023 convocation and/or professional development events during the 2023-2024 school year. Most notably, even though she was aware by no later than the August 2023 convocation that Oberhauser had bid back into the Middle School Complex,[38] Shrader did not request that Defendant take any action to "safeguard" her from Oberhauser at the beginning of the school year or at any point prior to October 2023.

Under these circumstances, the Court finds that no reasonable jury could conclude that Defendant "condoned, tolerated, or encouraged [Oberhauser's] retaliatory behavior" by failing to proactively institute a new plan and/or modify an existing plan. At the beginning of the 2023-2024 school year, there had been no significant incidents between Shrader and Oberhauser for approximately one year.[39] Given that there had been no "retaliatory behavior" by Oberhauser for

---

[38] Shrader testified that, at a gathering after the August 2023 convocation, the MIS and MJHS principals had a meeting in the cafeteria located in the Middle School Complex. (Shrader Depo. at Tr. 11-12.) Shrader testified that Oberhauser stood at a central table where the food was located and proceeded to socialize "the whole time until the meeting started" so that she could not go to the table to get her food. (*Id*. at Tr. 12-13.) Shrader testified that she had to ask Talkington to get food for her. (*Id*. at Tr. 12-13, 15-16.) *See also* Doc. No. 42-1 at PageID# 1486. Shrader testified that she chose not to report this incident at the time it occurred because she did not want to "jump to conclusions." (Shrader Depo. at Tr. 32-35, 37.)

[39] As noted *supra,* an incident occurred during a professional development program in August or September 2022. (Shrader Depo. at Tr. 8-9; Talkington Depo. at Tr. 10-11.) Shrader testified that she and Oberhauser were assigned different classrooms for this event, but that Oberhauser nonetheless came into her classroom and blocked her seat. (Shrader Depo. at Tr. 9.) *See also* Talkington Depo. at Tr. 10-11; Johnston Depo. at Tr. 13-15. Shrader (through

nearly a year, the Court finds that no reasonable jury could find that Defendant condoned, tolerated, or encouraged such behavior by failing to proactively implement a new plan. Nor could a reasonable jury conclude that Defendant "responded to [Shrader's] complaints so inadequately that the response manifests indifference or unreasonableness" given that Shrader (1) had not lodged any sort of complaint about Oberhauser for nearly a year; and (2) did not request that Defendant implement a new plan despite knowing that Oberhauser had bid back into the MJHS no later than August 2023. Thus, the Court rejects Shrader's argument that Defendant's failure to proactively implement a new plan in August 2023 creates a fact issue regarding the third element of her *Hawkins* coworker retaliation claim.[40]

The Court also rejects Shrader's argument that a reasonable jury could conclude that Defendant's responses to the October 2023 Pep Rally Incident, November 2023 Walkabout, and January 2024 Ice Cream Social "condoned, tolerated, or encouraged the acts of retaliation" and/or "manifest[ed] indifference or unreasonableness under the circumstances." *Hawkins,* 517 F.3d at 347. The record reflects that Defendant did not ignore or downplay Shrader's concerns about these incidents. To the contrary, Defendant (through its administrators) investigated each incident by obtaining and reviewing the relevant video footage; meeting with Shrader's union rep, Andrea Talkington; and conducting grieving meetings on November 13 and December 13, 2023 and January 10, 2024. During these meetings, there were discussions regarding whether the 2021 Plan was still

---

Talkington) filed a grievance regarding this incident, which ultimately resulted in Shrader and the MCSD entering into the September 2022 MOU. (Shrader Depo. at Tr. 9-10.)

[40] The Court finds that this conclusion is further supported by the undisputed fact that there were no incidents of any kind between Shrader and Oberhauser for the first two months of the school year, i.e., between August 2023 and October 20, 2023.

viable but it was decided that the 2021 Plan "no longer fit the situation because [Shrader and Oberhauser were now] in two different buildings on two different schedules." (Blair Depo. at Tr. 37.) *See also* Talkington Depo. at Tr. 21-22. The participants also discussed adding "something additional" to the September 2022 MOU. (Blair Depo. at Tr. 37.) Blair testified that "there was a draft of a .... potential plan" but that "it never came to fruition." (*Id.*) *See also* Talkington Depo. at Tr. 24, 45-46, 59. Blair explained that "communications broke down" going into the Level 3 Meeting on January 10, 2024 because "we could not come up with a proper resolution." (Blair Depo. at Tr. 38-40.)

Meanwhile, after the November 2023 Walkabout, Principal Carr (at Superintendent Salvino's direction) expressly told Oberhauser not to go past Shrader's classroom anymore. (Carr Depo. at Tr. 17, 24-25; Salvino Depo. at Tr. 55; Oberhauser Depo. at Tr. 41-42.) Oberhauser was receptive and it is undisputed that he has not walked past Shrader's classroom since the November 2023 Walkabout. (Carr Depo. at Tr. 17-18; Oberhauser Depo. at Tr. 42.) Moreover, after the January 2024 Ice Cream Social, Principal Carr gave Oberhauser a verbal warning. (Carr Depo. at Tr. 18-19.) Shortly thereafter, on February 8, 2024, Defendant implemented a mutual no-contact order via the Interim Supportive Measures. (Doc. Nos. 42-8, 42-26.) Defendant then retained external investigator David Morgan to investigate Shrader's and Oberhauser's Title VII Complaints; reviewed Morgan's final report; and adopted his recommendations by implementing the District Responsive Actions in May 2024. (Salvino Depo. at Tr. 74-75; Blair Depo. at Tr. 63-64; Morgan Depo. at Tr. 12-13; Doc. No. 42-39; Fortner Depo. at Tr. 18-19; Doc. No. 42-29.)

In sum, Defendant promptly investigated Shrader's complaints and implemented measures (first in the form of the Interim Supportive Measures and then the District Responsive Actions) to

address her concerns and prevent any interactions between herself and Oberhauser. Notably, Shrader has not directed this Court's attention to any evidence that she personally has had any further incidents with Oberhauser since the Interim Supportive Measures and District Responsive Actions were put in place.[41] Based on the above, the Court finds that Shrader has failed to come forward with sufficient evidence from which a reasonable jury could conclude that Defendant "condoned, tolerated, or encouraged [Oberhauser's] acts of retaliation" or responded to Shrader's complaints "so inadequately that the response manifests indifference or unreasonableness under the circumstances." *Hawkins,* 517 F.3d at 347.

Accordingly, and for all the reasons set forth above, the Court finds that Shrader has failed to come forward with sufficient evidence to create a genuine issue of material fact regarding the first and third elements of her *prima facie* case for coworker retaliation under Title VII.[42] The Court therefore finds that Defendant is entitled to summary judgment in its favor with respect to Count I of the First Amended Complaint.[43]

## V. Conclusion

---

[41] While Shrader asserts that Oberhauser violated the District Responsive Actions in February 2025 by visiting Ms. Spino's classroom, it is undisputed that Shrader did not witness this incident and was not present in or near the area when this occurred. (Shrader Depo. at Tr. 133; Talkington Depo. at Tr. 79.)

[42] In light of this finding, the Court need not (and will not) address the parties' arguments regarding causation and/or whether Defendant had a legitimate, non-discriminatory business reason for its actions.

[43] Even if Shrader's First Amended Complaint could be construed as raising a coworker hostile work environment claim under Title VII, the Court would find that Defendant is entitled to summary judgment in its favor with respect to this claim because, for all the reasons set forth above, Shrader has failed to come forward with sufficient evidence to create a genuine issue of material fact that (1) Oberhauser's harassing behavior during the 2023-2024 school year was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment; and/or (2) Defendant failed to take prompt and appropriate corrective action. *See Waldo*, 726 F.3d at 814; *Hawkins*, 517 F.3d at 332. Moreover, the Court notes that any claim for coworker hostile work environment would fail because Shrader has not come forward with any evidence that Oberhauser's allegedly harassing conduct during the 2023-2024 school year was "based on sex." *See Hawkins*, 517 F.3d at 332 (noting that the second element of the test for a coworker hostile work environment claim is that "the harassment was based on sex").

Accordingly, and for all the reasons set forth above, Defendant Massillon City School District Board of Education's Motion for Summary Judgment (Doc. No. 40) is GRANTED. This action is hereby TERMINATED.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE

Date: September 14, 2026